Argued and submitted March 9, accused suspended from the practice of law for period of 90 days, commencing 60 days from the filing of this decision September 30, 2004

## In re Complaint as to the Conduct of

## PAULA J. LAWRENCE,
*Accused.*

## (OSB 99-85; SC S50543)

98 P3d 366

Jane E. Angus, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the brief for the Oregon State Bar. With her on the brief was J. Michael Dwyer, Bar Counsel.

J. Mark Lawrence, of Lawrence & Lawrence, P.C., McMinnville, argued the cause and filed the briefs for the accused.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating various disciplinary rules of the Code of Professional Responsibility. The trial panel concluded that the accused violated Disciplinary Rule (DR) 1-102(A)(4) (engaging in conduct prejudicial to administration of justice), DR 1-103(C) (failing to respond fully and truthfully to disciplinary authorities), DR 7-102(A)(3) (concealing or knowingly failing to disclose that which lawyer is required by law to reveal), and DR 7-104(A)(2) (giving advice to person not represented by lawyer), and twice violated DR 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation). The trial panel suspended the accused from the practice of law for six months. The accused sought review in this court. ORS 9.536(1); Bar Rules of Procedure (BR) 10.1 and 10.3.

We consider the matter *de novo* and may adopt, modify, or reject the decision of the trial panel. ORS 9.536(3); BR 10.6. The Bar has the burden of establishing the alleged misconduct by clear and convincing evidence. BR 5.2. For the reasons that follow, we conclude that the accused committed all the alleged violations except two: The accused did not violate DR 1-102(A)(4) or DR 7-102(A)(3). We further conclude that a 90-day suspension is the appropriate sanction.

## I. FACTS AND PROCEDURAL BACKGROUND

We find the following facts by clear and convincing evidence. The accused was admitted to practice in 1989. She is an experienced criminal defense lawyer. In 1998, and at all times relevant to this proceeding, the accused worked "of counsel" for her husband's six-person law firm. At that time, the firm's lawyers included, among others, Kelly, who was a first-year associate. Lawyers at the firm often acted as court-appointed counsel for indigent defendants in criminal cases. The accused was the self-described "law guru" of the firm and routinely reviewed the files of the cases that the firm's associates handled to identify and draft motions that needed to be filed.

In 1996, Oregon voters approved Ballot Measure 40, a constitutional amendment that gave crime victims various rights in criminal prosecutions. By 1998, the accused had developed a theory that Measure 40 (then designated as Article I, section 42, of the Oregon Constitution (1996)[1]) granted to victims of domestic assault the right to require a trial court to dismiss the criminal charges against their assailants. She sent a memorandum to the other lawyers in the firm to keep an eye out for cases in which she could test her theory. Specifically, the accused asked the other lawyers in the firm to "[l]et me know ASAP if you have any cases that would work." She went on to write, "The way to set these cases up is for the victim to write/call [the deputy district attorney who is handling the case] and demand dismissal, and then tell [the deputy district attorney] who won't dismiss case that they want to address the judge."

In April 1998, the firm was appointed to represent Warren Battle in a domestic assault case. According to police reports, Warren Battle had grabbed his wife, Patricia Battle, pulled her out of a chair, and pushed her toward the bedroom. In so doing, he tore her clothes and left bruises, scratches, and red marks on her body. Those events took place in front of Patricia Battle's children. The firm assigned that case to Kelly, who had been working for the firm for about six weeks at that time.[2] Shortly thereafter, Kelly met with both Warren and Patricia Battle. Patricia Battle was not represented by counsel, and Kelly informed her of her rights under ORS 135.970 (requiring, among other things, that defense counsel inform the victim that she need not talk to him if she did not desire to do so). Patricia Battle told Kelly that she earlier had succeeded in having the court waive a "no-contact" condition that had been part of Warren Battle's release agreement and

---

[1] In June 1998, this court declared Measure 40 to be in violation of the separate-vote requirement of Article XVII, section 1, of the Oregon Constitution. *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998). The following year, the voters approved a new version of Article I, section 42, that still is in effect today. That new version of Article I, section 42, sets out the same "victim's rights" as those at issue in this proceeding, although it does not include all the provisions of the 1996 version of Article I, section 42 (enacted by Measure 40).

[2] Kelly had worked briefly for another lawyer before going to work for the accused's firm. He made the change of firms because he felt that he needed more help and supervision than he had received in his previous employment.

that she also had tried, unsuccessfully, to persuade the district attorney to dismiss the charges against her husband. At that time, she had assumed that the matter was out of her hands. She had no idea that she still might have an arguable basis for having the case dismissed, and she never had heard of Article I, section 42 (1996).

Kelly recognized that the Battles' circumstances fit the paradigm that the accused had identified in her memorandum to the firm and, accordingly, explained to the Battles the concept that the accused had developed. Kelly also explained to the Battles that the accused handled motions for the firm. Kelly told the Battles that he would talk to the accused about the case and then left the meeting. He went to the accused's office, where he proceeded to describe the situation and to show her a letter and a proposed affidavit that he had drafted for Patricia Battle's signature.

We note here that there is a great divergence in the testimony on this topic. The accused denies that she assisted Kelly at this time. However, not only did Kelly testify that the accused assisted him in revising the affidavit, but Patricia Battle also testified that Kelly had told her about another lawyer in the firm who had developed the Measure 40 theory and that, during the meeting with Kelly, Kelly had left the office to talk to that other lawyer about the affidavit. The trial panel, which had the opportunity to see and hear the witnesses, made credibility findings that the accused was evasive and argumentative and that Kelly was credible. Generally, this court gives weight to the trial panel's credibility findings, although the court reviews disciplinary cases de novo. In re Gustafson, 327 Or 636, 644-45 n 3, 968 P2d 367 (1998) (Gustafson I). In light of the accused's manner of testifying (which the trial panel correctly characterized as evasive and argumentative), together with the fact that Patricia Battle's testimony bolsters Kelly's, we accept the trial panel's credibility findings and find that the accused did revise Patricia Battle's affidavit in the ways described below.

When Kelly presented the affidavit to the accused, it contained only one substantive paragraph, stating in effect that Patricia Battle wished to assert what she claimed

washer right under Article I, section 42, of the Oregon Constitution (1996) to have the case against her husband dismissed. The accused added two paragraphs to the affidavit, one stating that Patricia Battle had contacted the district attorney's office and communicated her wishes that the case be dismissed, and one stating that the district attorney had not responded. The letter was directed to the district attorney and asked him to schedule a hearing to dismiss the criminal charges. The accused apparently did not change the accompanying letter.

Kelly typed the documents while Patricia Battle was in the office; Patricia Battle then signed them.[3] Both the letter and the affidavit were printed on plain white paper and bore no indication that they had been prepared by the accused's law firm. As noted, Patricia Battle later testified that, at the time that she met with Kelly, she knew nothing about Article I, section 42 (1996). Neither Kelly nor the accused ever advised Patricia Battle that she should seek independent counsel. The affidavit eventually was filed with the court, and the letter was sent to the district attorney.

The next day, the accused reviewed the Battle file, did some legal research, and drafted a brief entitled "Amicus Brief in Support of Crime Victim's Right to Compel Dismissal of Charges." After she talked to Kelly about the information that he had obtained from Patricia Battle, the accused signed the brief and, she testified, gave it to Kelly for filing and service. (Kelly did not recall how the documents were filed and served.)

In any event, the accused's office sent the brief to the court (and served it on the district attorney) without any

---

[3] The letter that Patricia Battle signed stated:

"It has come to my attention as the victim in the above mentioned case that I have certain rights under the Oregon Constitution. I am referring specifically to Article I § 42 of the Oregon Constitution. Acting pursuant to these rights I am requesting that you schedule a hearing to dismiss the charges against Warren Battle."

As Kelly originally drafted the affidavit, it simply provided: "I wish to assert the rights given to me under the Oregon Constitution Article I § 42." As signed by Patricia Battle, it also included the following two sentences: "I have contacted the District Attorney's office and communicated my wishes that this case be dismissed," and "[t]he District Attorney has not responded."

attachment; the affidavit was filed separately. No one filed a motion to dismiss the charges against Battle, but the court scheduled a hearing in the matter for May 1998. Neither the trial court judge nor the court clerk knew how the hearing on the motion to dismiss came to be placed on the calendar.

The accused and Kelly met with the Battles in the accused's office on the morning of the hearing, to prepare Patricia Battle for the hearing. Present at the meeting were the accused, Kelly, the Battles, and Patricia Battle's sister, Scott. According to Scott, the accused was "in charge of the meeting." The accused told Patricia Battle that she would be helping her with what to say to get the charges dismissed, as well as how to say it. She explained how the hearing would proceed and what Patricia Battle should tell the court. Specifically, she told Patricia Battle that she should say that her rights had been violated. The accused also stated at that meeting that she did not want Patricia Battle to be sworn in as a witness at the hearing, because she did not want any sworn statements on the record that later could be used in the criminal case against Warren Battle. The accused did not tell Patricia Battle that her interests might be in conflict with her husband's or that she should seek her own counsel. It appears that, during the meeting, Patricia Battle did not fully understand that the accused represented only Warren Battle. Scott, for her part, affirmatively formed the impression that the accused represented Patricia Battle.

Following the meeting, the accused, Kelly, the Battles, and Scott appeared before Judge Harris at the hearing concerning the request to dismiss the charges. The accused appeared as Warren Battle's lawyer. Judge Harris asked the accused if she was representing Patricia Battle, and she answered no. During the hearing, Judge Harris asked that Patricia Battle be sworn to make a statement. The accused objected. According to the accused, she did so because the request was "procedurally inappropriate," insofar as the motion was Patricia Battle's own and Patricia Battle was appearing before the court, therefore, to represent herself *pro se*, not as a witness.

During the course of the hearing, Judge Harris became concerned that members of the accused's firm had

been giving legal advice to Patricia Battle, the victim, while representing her husband, the defendant. Among other things, the accused prefaced a question to Patricia Battle during the hearing with the statement, "[Y]ou told me in my office * * * some of the things that you did to make contact with various persons in the district attorney's office * * *." In addition, Judge Harris had observed that the affidavit was notarized by a person in the accused's office and appeared to have been professionally prepared, but no lawyer's name appeared on the document. Accordingly, before ruling on the motion, he called the lawyers into chambers and expressed his concerns.[4] He later testified before the trial panel that he told the accused that he thought that there was an ethical conflict and that he was concerned about it and wanted to "explore and invite response." In the course of the in-chambers meeting, Judge Harris pointedly asked the accused if she had been giving advice to Patricia Battle.[5]

The accused did not then (or at any other time) respond directly to Judge Harris's question. Instead, she told Judge Harris that she was allowed to communicate with the victim and that it was appropriate to involve herself as she had. The accused did not disclose the specifics of any communications that she or any other lawyer at the firm had had with Patricia Battle. She did not tell Judge Harris that Kelly had met with the Battles and had advised Patricia Battle that she might have a constitutional right to have the charges against her husband dismissed; she did not mention that the firm had prepared the affidavit and the letter and that she had made substantive additions to the affidavit; she did not inform Judge Harris that she had told Patricia Battle that she would try to prevent her from being sworn as a witness; and she did not disclose—although one of her questions

---

[4] It is clear that Judge Harris was not seeking to punish any unethical conduct that he might uncover; rather, he simply wished to be sure that he understood what legal advice, if any, Patricia Battle had received. See *Kidney Association of Oregon v. Ferguson*, 315 Or 135, 143, 843 P2d 442 (1992) (not trial court's function to punish ethical violations as such).

[5] Judge Harris later testified that, although he had not specifically asked the accused if she or anyone at her firm had had contacts with Patricia Battle, he expected the accused to disclose all facts relevant to the question whether she and others were providing legal advice to Patricia Battle, including detailing the firm's contacts with both Warren and Patricia Battle.

to Patricia Battle in open court certainly suggested it—that she had met with the Battles earlier that day. Instead, she spoke generally of her right to facilitate a victim's effort to have the charges against an assailant dismissed and then returned to her legal arguments in support of the "amicus" brief. Upon returning to the hearing, Judge Harris denied Patricia Battle's request to have the charges against her husband dismissed.

A few days later, the accused sent a letter to Judge Harris to address his apparent concern that "an alleged action" by her or her law firm represented a conflict of interest,[6] a conflict that she herself claimed not to see. She stated that, as she saw it, the interests of the defendant and the victim were not in conflict, because each wanted the criminal charges dismissed. Although she acknowledged Judge Harris's concerns, she still did not provide him with any factual details about her firm's contact with Patricia Battle or what she had done on Patricia Battle's behalf. Instead, she analogized her situation to that of a lawyer representing a defendant who approaches a victim about preparing documents memorializing a civil compromise. She did not mention Kelly in her letter at all.

Judge Harris responded to that letter in a letter of his own in which he stated, "[B]ased on your analysis of the applicable statute and DR's, I am satisfied that my impression and belief at the time of our conversation, was incorrect." Judge Harris went on to "apologize for the error."

In June 1998, a Yamhill County deputy district attorney filed a complaint with the Disciplinary Counsel's Office concerning the accused's conduct. Subsequently, the Disciplinary Counsel's Office asked the accused to explain whether her "advice to Patricia Battle and preparation of an Amicus Brief on [Battle's] behalf violated DR 7-104(A)(2)." In response, the accused wrote a letter, as she put it, to "clear up two misconceptions." First, she stated, "I did not advise Patricia Battle. All pre-hearing contact with Ms. Battle was with another attorney employed by my law firm." She did not

---

[6] What the accused sought to accomplish by use of the word "alleged" escapes us. Whatever the nature of the transaction between the accused's firm and Patricia Battle, there certainly had been *some* interaction between them.

qualify or explain those representations in any way. Rather, she confined her explanation to a recitation of what Patricia Battle had told the other firm lawyer at the April meeting. Second, she clarified that she had not filed the *amicus* brief on Patricia Battle's behalf, but on behalf of the firm's client, Warren Battle. She concluded by elaborating on her view that there was no possibility of a conflict of interest in any event, because both Warren Battle and Patricia Battle desired the same outcome: dismissal of Warren Battle's criminal case.

The Disciplinary Counsel's Office referred the matter to a Local Professional Responsibility Committee (LPRC) for further investigation. Among other things, the accused told the LPRC investigator that Kelly had been the other lawyer involved. Additionally, she later stated in her deposition that, when she used the phrase, "pre-hearing contact" in her initial response to the Bar's inquiry, she meant contact *before* the day of the hearing, not contact *on* the day of the hearing.

The Bar filed its formal complaint against the accused in October 2000; the charges were heard in November 2001. The trial panel did not issue its opinion until June 4, 2003, more than 18 months after the trial and more than five years after the events that led to this proceeding. As noted, the trial panel concluded that the accused had committed all the charged violations of the disciplinary rules and suspended the accused from the practice of law for six months.

## II. ALLEGED VIOLATIONS

### A. *Advising Unrepresented Person*

In its first cause of complaint, the Bar alleges that the accused violated DR 7-104(A)(2) when she assisted and directed another lawyer in her firm in advising Patricia Battle concerning her supposed right as a crime victim under Article I, section 42, of the Oregon Constitution (1996) to have the criminal charges against her husband dismissed; when the accused revised an affidavit on that matter drafted by the other lawyer in the firm on Patricia Battle's behalf; and when she met with Patricia Battle in her office on the day of the hearing to prepare Patricia Battle for the hearing.

DR 7-104(A) provides, in part:

"During the course of the lawyer's representation of a client, a lawyer shall not:

"* * * * *

"(2) Give advice to a person who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such person are or have a reasonable possibility of being in conflict with the interests of the lawyer's client."

It is undisputed that Patricia Battle was not represented by a lawyer and that neither the accused nor anyone at her firm advised Patricia Battle to secure counsel. To establish that the accused violated DR 7-104(A)(2), then, the Bar must show, by clear and convincing evidence, that Patricia Battle's interests were, or had the reasonable possibility of being, in conflict with those of the accused's client, Warren Battle, and that the accused gave Patricia Battle "advice." We address each of those requirements in turn.

The accused steadfastly has maintained that Patricia Battle's interests were not in actual conflict with those of the accused's client because both desired the same outcome, *viz.*, dismissal of the criminal charges against Warren Battle. However, the rule against giving advice to an unrepresented person applies both in cases in which the interests of the two parties actually conflict and in which there is the *reasonable possibility* of the interests conflicting. The question, then, is whether there was a reasonable possibility of Patricia Battle's interests being adverse to those of her husband, notwithstanding the fact that they had a common desire, at least for some period of time, in having the criminal case against Warren Battle dismissed.

Although DR 7-104(A)(2) does not specify what it means for the interests of an unrepresented person to conflict with those of the lawyer's client, the disciplinary rule defining what constitutes a conflict of interest in the representation of current clients, DR 5-105(A), provides useful context. That rule states that a conflict may be "actual" or "likely."[7] Of

---

[7] DR 5-105 provides:

"(A) A conflict of interest may be actual or likely.

particular pertinence here, a "likely" conflict of interest is defined in DR 5-105(A)(2) as a "situation[ ] in which the objective personal, business or property interests of the clients are adverse."

We think that the objective personal interests of an alleged batterer and the batterer's victim are inherently adverse and, therefore, that there is a "likely" conflict of interest when a lawyer gives advice to both the abuser and the victim. For example, an unrepresented victim who is financially or otherwise dependent on the abuser may think that he or she has few options available other than to have the abuser return to the home to support or help the victim and any children involved. The victim, therefore, may be motivated to recant for reasons other than that the abuse did not happen.[8] Such a scenario could place the victim in a position of having to lie, thereby placing the victim in danger of being charged with perjury or filing a false police report, among other things. In addition, a lawyer who has only the victim's interests in mind well may be able to show the victim that other resources are available to assist him or her and that it would be in his or her and (and any children's) best interest to have the abuser prosecuted.[9]

In fact, the accused's conduct at the hearing demonstrates that she thought that there was a possibility of a conflict of interest. The accused objected to Patricia Battle being sworn in during the hearing on the motion to dismiss the

"(1) An 'actual conflict of interest' exists when the lawyer has a duty to contend for something on behalf of one client that the lawyer has a duty to oppose on behalf of another client.

"(2) A 'likely conflict of interest' exists in all other situations in which the objective personal, business or property interests of the clients are adverse. A 'likely conflict of interest' does not include situations in which the only conflict is of a general economic or business nature."

[8] In the present case, Patricia Battle stated in her request for waiver of the no-contact condition of Warren Battle's release agreement that her husband never had been abusive to her and that she needed him at home to care for their two daughters while she was at work.

[9] Unlike certain kinds of conflicts covered by DR 5-105, particularly by DR 5-105(D) and (F), which provide a way (with "consent * * * after full disclosure") for a lawyer to represent two clients whose interests may be adverse, the prohibition in DR 7-104(A)(2) is not waivable.

charges against Warren Battle. The accused made that objection, as she earlier had informed Patricia Battle that she would, because she was concerned that anything that Patricia Battle said under oath at the hearing could be used later against Warren Battle at his criminal trial. In addition, it is significant that the accused knew from the police reports in Warren Battle's client file that Patricia Battle had been injured in the altercation that had led to Warren Battle's arrest, that children had been present at the time of the incident, and that Warren Battle had a criminal record and was a registered sex offender. Those facts suggest to us (and, we think, also must have suggested to the accused, notwithstanding her protestations to the contrary) that the Battles' objective personal interests were adverse and, therefore, that a likely conflict of interest existed between them. Based on the foregoing, we hold that the interests of Patricia Battle were or had the reasonable possibility of being in conflict with those of the accused's client, Warren Battle.

We next turn to the question whether the accused gave Patricia Battle advice other than the advice to secure counsel. The word "advice" is not defined either in DR 7-104(A)(2) or elsewhere in the disciplinary rules. This court has not discussed or defined the term in this context. Indeed, even familiar authority proves less than helpful.[10] However, this is not a proceeding that requires us to explore the outer boundaries of the types of information that a lawyer might offer an unrepresented person without running afoul of DR 7-104(A)(2). Here, the record shows by clear and convincing evidence that the accused had developed a novel interpretation of a new constitutional provision, Article I, section 42, of the Oregon Constitution (1996); that the accused, through Kelly, informed Patricia Battle (who never before had heard of Article I, section 42 (1996)) that, under her theory, Patricia Battle had a constitutional right to have the charges against her assailant dismissed; that the accused suggested to Patricia Battle, through Kelly, that Patricia Battle pursue a specific course of conduct to accomplish that end; that the accused assisted Kelly in drafting an affidavit for Patricia

---

[10] For example, *Black's Law Dictionary* defines "advice" as "[g]uidance offered by one person, esp. a lawyer, to another." *Black's Law Dictionary* 55 (7th ed 1999).

Battle's signature that explained that Patricia Battle wished to avail herself of her alleged constitutional right; and that the accused prepared Patricia Battle for the hearing before Judge Harris, telling her what to say and how to say it. Based on the foregoing, we conclude that the accused gave Patricia Battle, an unrepresented person, "advice," as that word is used in DR 7-104(A)(2).

The accused insists that DR 7-104(A)(2) does not prohibit a lawyer from giving an unrepresented person "procedural information," as opposed to "legal advice," and that, because the accused reasonably thought that she had given Patricia Battle only procedural information, the entire disciplinary case against her, including the charges relating to misrepresentation by omission and prejudice to the administration of justice, fails. Assuming for purposes of argument that the accused is correct that a lawyer may give procedural information to an unrepresented person without violating DR 7-104(A)(2), our recitation of the facts above demonstrates that what the accused did here went beyond that. In light of our earlier conclusion that Patricia Battle's interests had a reasonable possibility of being in conflict with the interests of the accused's client, Warren Battle, we hold that the accused violated DR 7-104(A)(2).

B. *Failing to Disclose Certain Communications to Judge*

The Bar further alleges in its first cause of complaint that the accused violated DR 1-102(A)(3) (prohibiting conduct involving dishonesty or misrepresentation), DR 1-102(A)(4) (prohibiting conduct prejudicial to administration of justice), and DR 7-102(A)(3) (professional misconduct knowingly to conceal or fail to disclose that which lawyer is required by law to reveal) in the course of her communications with Judge Harris.

We turn first to the conduct allegedly involving dishonesty and misrepresentation. DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

■ ■ A lawyer violates DR 1-102(A)(3) either when the lawyer makes an affirmative false statement or when the lawyer remains silent despite having a duty to speak. *In re Claussen*, 331 Or 252, 261, 14 P3d 586 (2000) (*Claussen II*); *Gustafson I*, 327 Or at 647. A misrepresentation, "whether direct or by omission, must be knowing, false, and material in the sense that the misrepresentations would or could significantly influence the hearer's decision-making process." *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001). As this court stated in *Gustafson I*, "in the context of misrepresentation by nondisclosure under DR 1-102(A)(3), the 'knowing' element requires that the accused lawyer know both that the lawyer is failing to disclose information that the lawyer has in mind *and* that that information is material to the case at hand." 327 Or at 648 (emphasis in original).

■ A misrepresentation to a court by nondisclosure also may constitute "conduct that is prejudicial to the administration of justice" in violation of DR 1-102(A)(4).[11] To conclude that a lawyer has violated DR 1-102(A)(4), this court must determine the existence of each of three elements: (1) the lawyer engaged in "conduct," that is, the lawyer did something that he or she should not have done or failed to do something that the lawyer should have done; (2) the conduct occurred during the "administration of justice," that is, during the course of a judicial proceeding or another proceeding that has the trappings of a judicial proceeding; and (3) the lawyer's conduct resulted in "prejudice," either to the functioning of the proceeding or to a party's substantive interests in the proceeding. *In re Haws*, 310 Or 741, 746-48, 801 P2d 818 (1990); *Gustafson I*, 327 Or at 643. Prejudice may result

---

[11] DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to:

"* * * * *

"(4) Engage in conduct that is prejudicial to the administration of justice[.]"

from repeated acts that cause some harm to the administration of justice or from a single bad act that causes substantial harm. *Gustafson I*, 327 Or at 643.

At the May 1996 hearing on the motion to dismiss the charges against Warren Battle, the accused knew that Kelly had presented Patricia Battle with the Article I, section 42 (1996), theory and that Patricia Battle had not been aware before that time that she might have some constitutional right to have the charges against her husband dismissed. The accused was aware that Kelly had drafted the letter and the affidavit. The accused was aware that she herself had added substantive paragraphs to the affidavit. The accused was aware that she had met with Patricia Battle earlier on the day of the hearing and had told Patricia Battle what would happen at the hearing, including telling her that the accused would not permit Patricia Battle to be sworn in and coaching her concerning what to say at the hearing and how to say it. Nonetheless, when Judge Harris brought the accused and the prosecutor into his chambers during the hearing and pointedly asked the accused whether she had advised Patricia Battle, she failed to disclose any of the foregoing. Instead, according to Judge Harris, she "spoke in terms of her authorization to do as she was doing; that is, that she believed that Measure 40 gave certain rights to the victim and that Ms. Battle had the right to pursue dismissal of the case; that [the accused], in her involvement in it, was, I believe, attempting to facilitate that."

As Judge Harris later testified before the trial panel, he may not have asked the accused specifically to disclose all the contacts that the accused and other lawyers at her firm had had with Patricia Battle, but the "tenor of where [he] was going" was to explore the nature of those contacts. Given the events in open court that first had preceded it, we think that the circumstances of the meeting in Judge Harris's chambers clearly called for the accused at least to inform Judge Harris of any and all facts pertinent to the question whether she had given Patricia Battle legal advice. Rather than do so, however, she knowingly concealed from the judge the details of her contacts with Patricia Battle. The accused had a duty to respond completely and candidly to the judge's questions;

instead, the accused dissembled, as she consistently was to do thereafter in her letter to Judge Harris and in her dealings with the Bar.

The accused maintains that she did not think that she had given Patricia Battle legal advice and, therefore, strictly speaking, she was truthful in her responses to Judge Harris. That argument entirely misses the mark. The question during the meeting in Judge Harris's chambers was not whether the *accused thought* that her conduct had violated the disciplinary rules. Rather, as discussed, the question was whether the accused's responses to Judge Harris were dishonest. As to that question, there is no doubt that the accused knew that the nature and content of her contacts with Patricia Battle were the reasons for the meeting in chambers and, therefore, would be material to Judge Harris's determination whether the accused had a conflict of interest. By deliberately avoiding giving Judge Harris the full picture of her contacts with Patricia Battle, the accused knowingly withheld material information that would have allowed Judge Harris the opportunity to assess the situation for himself.

The foregoing discussion demonstrates that information concerning the nature and extent of the accused's and her firm's contacts with Patricia Battle was information that "would or could significantly influence the hearer's decision-making process." *Eadie*, 333 Or at 53. Indeed, Judge Harris later testified that, had he known the full story, he would have come to a different conclusion than did the accused about whether she had given Patricia Battle advice. We conclude that, under the circumstances, the accused's answers to Judge Harris in chambers, and her statements in her subsequent letter to him, were misleading and amounted to misrepresentations by nondisclosure.

As this court stated in *In re Hiller*, 298 Or 526, 534, 694 P2d 540 (1985), "[a] person must be able to trust a lawyer's word as the lawyer should expect [the lawyer's] word to be understood, without having to search for equivocation, hidden meanings, deliberate half-truths or camouflaged escape hatches." The accused's half-truths to Judge Harris, both in chambers and in her subsequent letter, constituted

misrepresentations by nondisclosure in violation of DR 1-102(A)(3).

The trial panel also held that the accused's conduct in misrepresenting to Judge Harris the nature and extent of her and her firm's contacts with Patricia Battle was conduct prejudicial to the administration of justice in violation of DR 1-102(A)(4), but the trial panel did not support its conclusion with any written analysis. As discussed above, the Bar must establish three elements to demonstrate that a lawyer has violated DR 1-102(A)(4): (1) the lawyer engaged in conduct covered by the rule; (2) the lawyer's conduct occurred in the course of a judicial or some similar proceeding; and (3) the lawyer's conduct caused prejudice. *Haws*, 310 Or at 746-48. In this case, we agree that the accused's misrepresentation to Judge Harris at the meeting in chambers constituted "conduct" under the rule and that it occurred during the course of a judicial proceeding, *viz.*, the effort to have the charges against Warren Battle dismissed. However, the Bar has failed to prove the final element, prejudice.

To conclude that a lawyer's conduct resulted in "prejudice" under DR 1-102(A)(4), we must find that the lawyer engaged either in repeated acts causing some harm to the administration of justice or a single act that caused substantial harm to the administration of justice. *Haws*, 310 Or at 748. Here, the accused's conduct caused some harm to the functioning of the proceeding, insofar as it deprived Judge Harris of the ability to evaluate his legitimate concern that Patricia Battle's motion to obtain dismissal of the charges against Warren Battle might have been ill-advised and might have worked an injustice. However, given that Judge Harris denied Patricia Battle's motion, we do not think that any harm that the accused caused thereby was substantial, and the Bar has not argued otherwise. The Bar does not point to any other acts of the accused that, taken together with the misrepresentation to Judge Harris in chambers, would constitute repeated conduct causing some harm to the administration of justice.[12] The Bar, then, has failed to prove that the

---

[12] The Bar suggested in its brief, but did not argue, that the accused's later misrepresentations by nondisclosure in her follow-up letter to Judge Harris and in her eventual responses to the Bar's inquiry into her conduct constitute repeated acts triggering application of DR 1-102(A)(4). However, those later misrepresentations

accused engaged in conduct prejudicial to the administration of justice. Accordingly, we find the accused not guilty of violating DR 1-102(A)(4).

■ The Bar also alleged, and the trial panel found, that the accused's misrepresentations to Judge Harris constituted a violation of DR 7-102(A)(3). That rule provides, in part:

> "In the lawyer's representation of a client or in representing the lawyer's own interests, a lawyer shall not:
>
> "* * * * *
>
> "(3) Conceal or knowingly fail to disclose that which the lawyer is required by law to reveal."

The trial panel did not include any written analysis of DR 7-102(A)(3) in its opinion; instead, the panel simply concluded that the accused's conduct violated that provision. For its part, the Bar asserts only that, because DR 1-102(A)(3) obligated the accused to respond truthfully to the court and to reveal her firm's involvement with Patricia Battle, her knowing failure to do so also constituted a violation of DR 7-102(A)(3). However, in the absence of any persuasive argument by the Bar or analysis by the trial panel, we are not satisfied that DR 7-102(A)(3) is pertinent to the accused's conduct.[13]

■ Finally, the Bar also contends that the accused violated DR 7-102(A)(3), as well as DR 1-102(A)(3) and (4), when she permitted Patricia Battle's affidavit and letter to be filed with the court without indicating that her firm had prepared

---

did not affect the judicial proceeding before Judge Harris. Therefore, they are not the type of repetitious episodes of conduct that trigger application of DR 1-102(A)(4).

[13] We acknowledge that, in the past, this court summarily has concluded that a lawyer's conduct that violated DR 1-102(A)(3) also violated DR 7-102(A)(3). *See, e.g., In re Leonhardt*, 324 Or 498, 507-08, 930 P2d 844 (1997) (accused lawyer's misrepresentations to court that violated DR 1-102(A)(3) also violated DR 7-102(A)(3)); *In re Claussen*, 322 Or 466, 481, 909 P2d 862 (1996) (*Claussen I*) (court found violation of DR 7-102(A)(3) when accused lawyer intentionally failed to disclose to bankruptcy court facts that he was duty-bound to disclose, in violation of DR 1-102(A)(3). Notwithstanding those decisions, we do not think that the rote conclusion that conduct that violates DR 1-102(A)(3) automatically violates DR 7-102(A)(3) is proper. Therefore, in the absence of any persuasive argument or analysis from either the Bar or the trial panel indicating how DR 7-102(A)(3) is pertinent to this case, we decline to hold that the accused violated that rule.

them. The trial panel found that the evidence as to why both the letter and the affidavit did not indicate that they had been prepared by the accused's firm was ambiguous. We agree with that assessment. Based on that finding, the trial panel concluded, and we agree, that the Bar failed to present clear and convincing evidence that the facts that the two documents were printed on plain white paper and did not identify their authors amounted to a violation of either DR 1-102(A)(3), DR 1-102(A)(4), or DR 7-102(A)(3).

C. *Failing to Respond Truthfully to Disciplinary Authorities*

■ The Bar's second cause of complaint charges the accused with violating DR 1-103(C) and DR 1-102(A)(3) by failing to respond truthfully to the disciplinary authorities. DR 1-103(C) provides that "[a] lawyer who is the subject of a disciplinary investigation shall respond fully and truthfully to inquiries from * * * a tribunal or other authority empowered to investigate or act upon the conduct of lawyers." As discussed above, DR 1-102(A)(3) provides that it is professional misconduct for a lawyer to "[e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation."

Specifically, the Bar alleged, and the trial panel concluded, that the accused violated those rules when, in her letter to the Bar, she wrote without elaboration that "I did not advise Patricia Battle" and that "[a]ll pre-hearing contact with Ms. Battle was with another attorney employed by my law firm." In response to those charges, the accused continues to adhere to her position that she did not give Patricia Battle advice. She also argues that, when she used the phrase "pre-hearing contact," she meant contact with Patricia Battle before the date of the hearing.

We already have concluded that the accused did advise Patricia Battle. We also view the accused's explanation of her statement regarding "pre-hearing contact" as implausible. Accordingly, we find that the accused was untruthful with the Bar when she made both statements. However, before concluding that the accused violated DR 1-103(C) and DR 1-102(A)(3) when she made those untrue statements to the Bar, we think that more needs to be said.

In its letter to the accused, the Bar told the accused that it was requesting her response to allegations that her conduct with respect to Patricia Battle violated DR 7-104(A)(2), so that it could make a "fair and informed analysis of these allegations." Under both DR 1-103(C) and DR 1-102(A)(3), the accused had a duty to respond *fully* and truthfully to that letter. That is, the accused was obligated under both rules to disclose fully to the Bar investigator *all facts* pertinent to the ethical inquiry, including descriptions of all her and her firm's contacts with Patricia Battle. When the accused responded simply that she had not advised Patricia Battle and that all prehearing contact was with another lawyer in her firm, the accused had to have known that she was concealing information that was essential to the Bar's assessment whether the accused had violated the disciplinary rules. Thus, as in our analysis of the accused's conduct in her dealings with Judge Harris, the relevant inquiry does not turn solely on whether the accused, in her own mind, thought that she had not provided advice to Patricia Battle or that she had used the word "prehearing" to mean something different than commonly understood. It is critical that the accused knew that she had omitted material facts that would inform the *Bar's* analysis of her conduct.

We find that the accused was not truthful or complete in her response to the Bar. We hold, therefore, that the accused violated DR 1-103(C). We also hold that the accused's knowing misrepresentations to the Bar constitute a violation of DR 1-102(A)(3).

D. *Summary*

To summarize, we hold that the accused committed two violations of DR 1-102(A)(3), one violation of DR 1-103(C), and one violation of DR 7-104(A)(2). We turn to the appropriate sanction.

### III. SANCTION

This court follows a well-established methodology for determining the appropriate sanction for lawyer misconduct. The court begins by referring to the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards) for guidance. *In re*

*Gustafson*, 333 Or 468, 486, 41 P3d 1063 (2002) (*Gustafson II*). Under the ABA Standards, the court makes a preliminary determination of the appropriate sanction by considering three factors: the duty violated; the accused lawyer's mental state; and the actual or potential injury caused by the accused lawyer's misconduct. *In re McDonough*, 336 Or 36, 44, 77 P3d 306 (2003); ABA Standard 3.0. We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted. *Id.* Finally, we compare prior Oregon cases and the sanctions imposed in them. *McDonough*, 336 Or at 46; *Gustafson II*, 333 Or at 486.

## A. *Duties Violated*

By giving advice to an unrepresented person whose interests were adverse to those of her client, the accused violated her duty to the legal system. ABA Standard 6.0. By misrepresenting facts to the court, the accused violated her duty to the public to maintain her personal integrity. ABA Standard 5.0. By misrepresenting facts to the Bar during the investigation into her conduct, the accused violated her duties as a professional to cooperate completely and truthfully with a disciplinary investigation. ABA Standard 7.0.

## B. *Mental State*

Under the ABA Standards, an act is intentional if it is engaged in with the "conscious objective or purpose to accomplish a particular result." ABA Standards at 7. An act is knowing if it is engaged in with the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." *Id.* The accused's conduct with respect to Patricia Battle, Judge Harris, and the Bar demonstrate that she acted at least knowingly.

The accused knew that she and another person in her firm had given advice to and prepared documents for Patricia Battle, an unrepresented person. Her own actions in keeping Patricia Battle off the stand show that she knew that Patricia Battle's interests had a reasonable possibility of being adverse to those of Patricia Battle's husband, Warren Battle, the firm's client. The accused also acted knowingly when she failed to disclose to Judge Harris, both in chambers

and in her subsequent letter to him, the extent and content of her communications with Patricia Battle, at a time when she was aware of the nature of Judge Harris's concerns about a potential ethics violation arising out of her relationship with Patricia Battle. Finally, the accused knowingly omitted revealing that same information to the Bar in response to the Bar's inquiry into her conduct.

## C. *Injury*

The ABA Standards define "injury" as "harm to a client, the public, the legal system or the profession which results from a lawyer's conduct." ABA Standards at 7. To support the imposition of sanctions, injury may be actual or potential. *In re Williams*, 314 Or 530, 547, 840 P2d 1280 (1992). Potential injury is "harm to a client, the public, the legal system or the profession that is reasonably foreseeable at the time of the lawyer's misconduct." ABA Standards at 7. The accused caused potential injury to Patricia Battle when she gave Patricia Battle legal advice in a situation in which Patricia Battle's interests were reasonably likely to become adverse to those of a client of the accused's firm. The accused caused potential injury to the legal system when she withheld information from Judge Harris that would have assisted him in determining whether Patricia Battle truly understood the request that she purportedly was making. Finally, the accused caused injury to the profession when she failed to be truthful with the Bar.

## D. *Preliminary Sanction*

In light of the duties violated, the accused's mental state, and the injury caused by the accused's conduct, the ABA Standards suggest that a suspension is appropriate. *See* ABA Standard 6.12 (suspension generally appropriate when lawyer knows that material information improperly has been withheld and takes no remedial action, causing injury or potential injury to party or adverse effect on legal proceeding); ABA Standard 7.2 (suspension generally appropriate when lawyer knowingly engages in conduct that is violation of duty owed as professional and causes injury or potential injury to client, public, or legal system).

## E. *Aggravating and Mitigating Circumstances*

 We next consider the existence of any aggravating or mitigating circumstances that may affect the degree of the sanction to be imposed. ABA Standard 3.0. We find the existence of several aggravating circumstances. The accused engaged in a pattern of misconduct and multiple offenses. ABA Standards 9.22(c) and (d). Patricia Battle was a vulnerable victim. ABA Standard 9.22(h). The accused, who was admitted to practice in 1989, has substantial experience in the practice of law. ABA Standard 9.22(I).

In mitigation, the trial panel found the existence of only one factor: the accused has no prior disciplinary record. ABA Standard 9.32(a). After reviewing the record, however, we find the presence of additional mitigating factors. First, the accused introduced evidence that she has a reputation for honesty in the legal community. ABA Standard 9.32(g). In addition, there was a substantial delay in the disciplinary proceedings—specifically, more than five years had elapsed between the events that gave rise to these charges and the issuance of the trial panel's decision in this proceeding. ABA Standard 9.32(j) (amended 1992). A substantial part of that delay is attributable directly to the trial panel, which took 19 months to issue its opinion, during which time the Bar made multiple inquiries regarding the status of the decision. Finally, we find it significant that the accused's disciplinary record since the events that led to this proceeding apparently is unblemished. *See In re Lawrence*, 332 Or 502, 515, 31 P3d 1078 (2001) (citing delay and fact that no new complaints had been filed); *In re Unrein*, 323 Or 285, 288, 917 P2d 1022 (1996) (same).

## F. *Case Law*

We now turn to a consideration of the appropriate sanction in light of this court's case law. At the outset, we reject the accused's contention that a reprimand is the appropriate sanction. As noted, the ABA Standards suggest that a suspension is appropriate, and we conclude that the relative weight of the aggravating and mitigating factors in this proceeding does not support reducing the putative sanction to a reprimand.

The trial panel suspended the accused for six months. The Bar contends that the appropriate sanction is a suspension for a period of nine months to a year. The Bar contends that the facts in this case are similar to those presented in *In re Claussen*, 322 Or 466, 909 P2d 862 (1996) (*Claussen I*); *In re Jeffery*, 321 Or 360, 898 P2d 752 (1995); and *In re Brandt/Griffin*, 331 Or 113, 10 P3d 906 (2000). In *Claussen I*, this court suspended a lawyer for one year for his conduct in engaging in aggravated multiple client conflicts of interest, intentionally submitting documents to a bankruptcy court that he knew were untrue (thereby preventing the court from discovering his conflicts of interest), and repeatedly failing to disclose to a court material information that he had a duty to disclose. 322 Or at 488. In assessing the appropriate sanction in *Claussen I*, this court found the existence of several mitigating and aggravating circumstances. *Id.* at 486.

In *Jeffery*, this court suspended a lawyer for nine months for his conduct in simultaneously representing two codefendants in a criminal case, for continuing to represent them after it was alleged that he himself had participated in the same crime as his clients, for providing legal advice to an unrepresented person whose interests were adverse to those of his clients, and for threatening to refuse to put on a defense for his clients in the criminal case for the purpose of creating reversible error. 321 Or at 376. In assessing the appropriate sanction, the court found multiple aggravating circumstances and no mitigating circumstances. *Id.* at 375.

In *Brandt/Griffin*, this court suspended two lawyers for 12 and 13 months, respectively, for multiple ethical violations stemming from their conduct in entering into retainer agreements with parties whose interests conflicted with the lawyers' other clients, in intentionally misrepresenting facts and withholding information from their clients in an effort to mask their conflict, and in failing to respond truthfully to the Bar. 331 Or at 149. Again, this court found the presence of multiple aggravating and mitigating factors when assessing the appropriate sanction. *Id.* at 146-47.

In our view, the conduct in the instant case is much less egregious than that of the lawyers in the cases discussed above. Rather, we agree with the trial panel that the

accused's conduct in this proceeding most closely resembles the facts of *Gustafson I*, in which a district attorney was suspended for six months for, among other things, violating DR 1-102(A)(3) and DR 1-102(A)(4) by misrepresenting certain material facts to a court in the course of a criminal proceeding. 327 Or at 656. There, the balance of aggravating and mitigating factors was similar to that presented here: the accused also had no disciplinary record, but she acted with a selfish motive; she had substantial experience in the practice of law; she was deceptive during the disciplinary proceedings; and there was a vulnerable victim. *Id.* at 654.

## G. *Appropriate Sanction*

The facts of this case are sufficiently serious to justify an argument that the accused should receive a six-month suspension. However, in this case, the more than five-year delay, much of it post-hearing, coupled with the fact that the accused has not been subject to disciplinary action in the interim, militates in favor of a suspension of less than six months here. We conclude that suspending the accused from the practice of law for 90 days is appropriate.

The accused is suspended from the practice of law for a period of 90 days, commencing 60 days from the filing of this decision.