Argued and submitted March 7, accused suspended from the practice of law for 18 months, effective 60 days from the date of filing of this decision May 12, 2005

# In re Complaint as to the Conduct of

## SALLY LEISURE,
*Accused.*

## (OSB Nos. 02-149, 02-150, 03-31; SC S51514)

113 P3d 412

Mary A. Cooper, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

Sally Leisure, herself, Portland, argued the cause and filed the brief for the accused.

PER CURIAM

510

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) alleges that the accused violated Code of Professional Responsibility Disciplinary Rules (DR)[1] by writing numerous checks that, when she wrote them, her checking account could not cover. Based on that conduct, and its effect on two creditors in particular, the Bar charged that the accused had violated DR 1-102(A)(2) (engaging in criminal conduct reflecting adversely on a lawyer's honesty, trustworthiness, or fitness to practice law) and DR 1-102(A)(3) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation).[2]

A trial panel of the Disciplinary Board concluded that the accused did not violate DR 1-102(A)(2), but that she did violate DR 1-102(A)(3) due to her poor money management. It further determined that the appropriate sanction was an 18-month suspension, with all but three months stayed if the accused complied with certain terms. On review, the Bar seeks a full 18-month suspension with no period stayed.

■   Our review is *de novo*. ORS 9.536(3); BR 10.6; *In re Eakin*, 334 Or 238, 240, 48 P3d 147 (2002). The Bar must establish, by clear and convincing evidence, the alleged misconduct. BR 5.2. "Clear and convincing evidence means evidence establishing that the truth of the facts asserted is highly probable." *Eakin*, 334 Or at 240. On *de novo* review, we conclude that the accused violated both disciplinary rules as charged. We suspend the accused from the practice of law for 18 months, with none of that period stayed.

---

[1] The new Oregon Rules of Professional Conduct became effective January 1, 2005. The conduct at issue in this proceeding occurred before that date, and, therefore, the Code of Professional Responsibility applies.

[2] In addition, the Bar asserts that the accused is subject to discipline pursuant to ORS 9.527(1) (authorizing disbarment, suspension, or reprimand when lawyer acts in manner that would have been basis to deny admission to practice). For reasons that we have expressed in other cases, we decline to impose discipline for conduct that is otherwise covered under the disciplinary rules. *See In re Gustafson*, 333 Or 468, 470 n 1, 41 P3d 1063 (2002) (citing *In re Kimmell*, 332 Or 480, 487, 31 P3d 414 (2001) (declining to consider charge under ORS 9.527(1), because conclusion that accused lawyer had violated statute would not serve to enhance sanction)).

# I. FACTS

The accused has been a lawyer since 1983. Her practice focuses on debtor-creditor issues.

## A. *The Gallops Saddlery Matter*

The accused's daughter participated in the sport of English show riding. McCarthy, part owner of a business called Gallops Saddlery and a long-time participant in the sport herself, testified before the trial panel that, in her estimation, English show riding involves between $900 and $2,000 in monthly fees, excluding the cost of a horse.

On August 19, 2001, the accused wrote a personal check for $1,400 to Gallops Saddlery as the final payment for a $3,000 custom-made saddle for her daughter. The accused's bank did not honor the check, because the accused did not have sufficient funds in her bank account. An employee of Gallops Saddlery later called the accused about the check. The accused told the employee that she would cover the check by either the third or fourth day of September 2001 and would contact Gallops Saddlery to let them know that the funds were in her bank account.

The accused did not call Gallops Saddlery within the time that she had specified, and the owner of Gallops Saddlery tried to contact the accused. The owner left the accused several messages that went unanswered until September 8, 2001. On that day, the accused told the owner of Gallops Saddlery that the check would be covered by September tenth or eleventh. On the day before that telephone call, September 7, 2001, the accused's bank account balance had been $574.97, and she had made a deposit of $900. However, by September 11, 2001, the accused had made two automated teller machine (ATM) withdrawals totaling $163.25 and had made two debit card purchases totaling $108.97. Four checks totaling $677.50 also had been presented to the bank for payment out of the accused's account. The owner of Gallops Saddlery called the accused's bank on September 11, 2001, and was informed that there were still insufficient funds in the accused's bank account to cover the $1,400 check.

The accused eventually covered the check on October 10, 2001. In the meantime, however, Gallops Saddlery incurred both bank and lawyer's fees in its efforts to obtain payment from the accused. The owner of Gallops Saddlery subsequently filed an ethics complaint against the accused with the Bar.

B. *The Combs Matter*

In 1996, the accused represented McCulloch in litigation against Price Waterhouse Coopers, LLP (PWC). Before trial, the accused asked another lawyer, Combs, to try the case and to act as her co-counsel. At that time, Combs was an associate with Case & Dusterhoff, LLP. Accordingly, the accused entered into an agreement with Case & Dusterhoff regarding the fees for the case. The accused and Case & Dusterhoff agreed that they would divide the attorney fees equally after the deduction of costs.[3]

The accused and Combs successfully litigated the McCulloch case against PWC. McCulloch, however, was not satisfied with the judgment and refused to pay the accused and Combs their fees. The accused then hired Yugler to represent her in a suit against McCulloch for the unpaid fees. For the purposes of recovering the fees, Case & Dusterhoff assigned its interest in the fees to the accused. The accused agreed that, upon any recovery, she would pay Case & Dusterhoff according to their fee agreement. In October 2001, Yugler obtained a judgment against McCulloch for $158,265 plus an additional $33,252.51 in post-judgment interest. Yugler then sought to collect that money from McCulloch.

Between January and August 2002, Yugler collected approximately $21,000 from McCulloch. Yugler then disbursed approximately $8,900 to the accused on four separate occasions between March and August 2002. The accused did not disclose her receipt of those funds to Case & Dusterhoff, even though she had calculated that her total share of the costs was only $7,253.16. In August 2002, Yugler recovered $186,017.17 from McCulloch, and he disbursed $122,807.05

---

[3] Testimony before the trial panel indicated that the agreement had not been in writing, but that both parties had acknowledged it.

to the accused. Again, the accused did not immediately disclose her receipt of those funds to Case & Dusterhoff. She deposited the check into her business account, which the bank credited with a deposit for $121,807.05[4] on August 30, 2002. By August 31, 2002, the balance in the accused's business account was $114,235.71.

On August 30, 2002, Yugler told Case about the $122,807.05 payment to the accused. Case then requested an accounting from Yugler. Assuming that he soon would receive payment from the accused, Case went on vacation until September 9, 2002. By the time that Case returned from vacation, the accused's account balance had dwindled to $89,221.22. The accused also had not yet disclosed to Case & Dusterhoff her receipt of the funds from Yugler. Case contacted the accused on September 10, 2002, and the accused told him that the money was in her bank account but she could not yet distribute the funds because the bank was holding Yugler's check and had not credited the funds to her account. On September 18, 2002, Case received the accounting that he had requested from Yugler and discovered, for the first time, that Yugler had made several payments to the accused.

Case immediately demanded payment from the accused. The accused acknowledged that she owed Case & Dusterhoff $55,813.94, and, on September 18, 2002, she wrote a check to Combs for that amount. However, on September 18, 2002, the accused's account balance was only $37,153.36. Combs immediately sought to cash the check, but the accused's bank refused to honor the check because the accused's account did not contain sufficient funds. Combs then went to the accused's office regarding the check. The accused initially told him that the bank had made a mistake, but later that day she told him that the bank had not honored the check because her account was $6,000 or $7,000 short. Case and Combs then asked the accused to issue to them a check for an amount that her account could cover. She told them that she would provide them with a check for $48,000

---

[4] Upon her deposit of the check for $122,807.05, the accused immediately withdrew $1,000 in cash.

the next day. On September 19, 2002, the accused provided Case & Dusterhoff with a cashier's check for $35,000.

After they received the $35,000 check, Case and Combs sought to recover the remaining $20,813.94 from the accused. Case told the accused that, if she did not promptly honor her obligation, he would have no choice but to file a complaint with the Bar. The accused responded by asserting that she was guilty only of a breach of contract.

During the first week of October 2002, the accused provided Case & Dusterhoff with three checks that totaled $20,813.94. One was dated October 4, 2002, and was for $10,000, and two were dated October 5, 2002, and were for $5,813.94 and $5,000, respectively. The accused's account did not contain sufficient funds to cover any of those checks. Combs later cashed the $10,000 check on October 15, 2002, the $5,000 check on October 22, 2002, and the $5,813.94 check on December 12, 2002. The third check cleared after Case filed a complaint with the Bar.

During the hearing before the trial panel, the following colloquy between a member of the panel and the accused ensued:

"MR. HYATT:   * * * [A]s I understood the testimony[,] there was a legal document by which Case & Dusterhoff's interest and those of Mr. Combs were assigned to you for purposes of collection, right?

"MS. LEISURE:   Uh-huh. To bring the lawsuit.

"MR. HYATT:   Would you agree from a legal standpoint that created a formal fiduciary obligation on your part to protect their interest?

"MS. LEISURE:   I guess I think of a fiduciary as a little bit more formal, like a trustee or something. I certainly had a contractual duty to pay them and I did pay them."

C.   *The Accused's Financial Practices*

During 2001, approximately 342 checks were drawn on the accused's checking account and presented for payment from that account. Of those checks, the bank returned 98, and the accused incurred either "overdraft item" or "returned

item" charges on more than 200. All 26 checks that were presented for payment from the accused's account in October 2001 resulted in nonsufficient funds (NSF) fees. Between September 24 and October 26, 2001, the accused's account was overdrawn by thousands of dollars. Over the course of 2001, the accused incurred $5,600 in overdraft fees.

Between April 1997 and August 2002, various courts entered 17 judgments against the accused relating to her unpaid debts. The state also had placed tax liens on her real property in regard to her unpaid property tax obligations.

Between October 1, 2002 and July 31, 2003, the accused issued to an associate, who worked for her at that time, $12,500 in NSF checks for wages. In February 2004, the accused filed a petition for bankruptcy pursuant to Chapter 13 of the United States Bankruptcy Code.

### D. *Proceedings Below*

The Bar charged the accused with violating DR 1-102(A)(2) and DR 1-102(A)(3) for each of the above-described matters. After a hearing, the trial panel concluded that the accused had violated DR 1-102(A)(3) by engaging in a course of negligent conduct that resulted in the following actions (or inaction) on her part: (1) "failing to make good the check written to Gallops [Saddlery], despite a number of promises to do so"; (2) "failing to take whatever action was necessary to assure [that] her personal financial situation did not impact on her ability to be trustworthy"; (3) "representing the three checks written to Case and Duster[h]off [were] negotiable, when in fact the Accused knew they were not"; and (4) "failing to make good the checks written to Case and Duster[h]off in a timely manner." The panel concluded, however, that the accused did not have the mental state necessary to be guilty of a crime and thus that she had not violated DR 1-102(A)(2).

The trial panel applied the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (ABA Standards), but applied no mitigating or aggravating factors under those standards. It decided that the appropriate sanction, was an 18-month suspension with all but three months of that suspension stayed pending the

accused's compliance with certain conditions. Those conditions included the accused working under the supervision of another lawyer, the accused submitting monthly audits of her finances to the Professional Liability Fund, and the accused completing a course in practice management.

For the reasons that follow, we disagree with the trial panel's conclusion that the accused did not violate DR 1-102(A)(2), and we agree with the trial panel that the accused violated DR 1-102(A)(3).

## II. DISCUSSION

### A. *DR 1-102(A)(2)*

DR 1-102(A)(2) provides, in part, that "[i]t is professional misconduct for a lawyer to * * * [c]ommit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness to practice law[.]" This court recently explained that, in determining whether an accused lawyer violated DR 1-102(A)(2), the court "first must determine what criminal act the accused committed, then whether that act reflects adversely on the lawyer's honesty, trustworthiness, or fitness to practice law." *In re Summer*, 338 Or 29, 36, 105 P3d 848 (2005) (citing *In re Allen*, 326 Or 107, 120-21, 949 P2d 710 (1997)). In addition, this court has explained that, "[f]or the rule to apply, the lawyer need not be convicted of the crime, nor must criminal conduct be established beyond a reasonable doubt[.]" *Summer*, 338 Or at 36. Rather, the Bar only must "establish the criminal act by clear and convincing evidence." *Id.* (citing *In re Lawrence*, 332 Or 502, 507, 31 P3d 1078 (2001); *In re Anson*, 302 Or 446, 453-54, 730 P2d 1229 (1986)).

The Bar argues that, by writing NSF checks during 2001 and 2002, the accused repeatedly committed the crime of negotiating a bad check, as defined by ORS 165.065, which provides, in part:

"(1)   A person commits the crime of negotiating a bad check if the person makes, draws or utters a check or similar sight order for the payment of money, knowing that it will not be honored by the drawee.

"(2)   For purposes of this section, unless the check or order is postdated, it is prima facie evidence of knowledge that the check or order would not be honored if:

"(a)   The drawer has no account with the drawee at the time the check or order is drawn or uttered; or

"(b)   Payment is refused by the drawee for lack of funds, upon presentation within 30 days after the date of utterance, and the drawer fails to make good within 10 days after receiving notice of refusal."

In addition, ORS 161.085(8) provides, in part, that " '[k]nowingly' or 'with knowledge' * * * means that a person acts with an awareness that the conduct of the person is of a nature so described or that a circumstance so described exists." Negotiating a bad check is a Class A misdemeanor. ORS 165.065(3)(a).

The Bar also posits that the accused is not fit to practice law because her conduct (1) demonstrated that she knowingly wrote several NSF checks; (2) demonstrated a disrespect for the law; (3) victimized each person to whom she wrote an NSF check due to the efforts that each had to undertake to be paid; and (4) established a pattern of criminal conduct.

The accused asserts that she committed no crime but, instead, breached a series of contracts. She argues that ORS 165.065 requires a complete failure to pay, or a theft, to fall within its scope and that she has honored every check that she has written.[5]

As set out in *Summer*, 338 Or at 36, we begin by determining whether the Bar has proved by clear and convincing evidence that, when the accused wrote the NSF checks, she did so in violation of ORS 165.065. We interpret the text of ORS 165.065 by applying the statutory construction methodology set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We

---

[5] The accused also asserts that the Bar may not discipline a lawyer when the lawyer has filed a petition for bankruptcy. The record indicates, however, that these disciplinary proceedings began well before the accused filed for bankruptcy in February 2004. We reject the accused's contention in that regard without further discussion.

begin by examining the text and context of that statute. *Id.* at 610-11.

ORS 165.065 provides that, to be guilty of the crime of negotiating a bad check, a person must: (1) make, draw or utter a check for the payment of money, (2) knowing that the check will not be honored by the drawee. As relevant here, ORS 165.065 further provides that it is *prima facie* evidence that the statute has been violated if "[p]ayment is refused by the drawee for lack of funds[ ] within 30 days after the date of utterance, and the drawer fails to make good within 10 days after receiving notice of refusal."

The facts establish that the accused failed to make good, within 10 days after receiving notice that her bank refused to pay, the checks that she had issued to Gallops Saddlery and the three checks totaling $20,813.94 that she had issued to Case & Dusterhoff. That evidence therefore establishes clearly and convincingly that the accused violated ORS 165.065 on at least four occasions.

In addition, between September 24 and October 26, 2001, the accused's account always had a negative balance. On September 27, 2001, the accused's account had a negative balance of $3,141.98 and consistently thereafter had a negative balance that exceeded $2,000. The accused also made only two deposits to her account between September 24 and October 26, 2001. One was for $1,000 on September 28, 2001, and the other was for $1,102.74 on October 1, 2001. Despite having made only two deposits that together were not sufficient to cover the more than $3,000 deficit in the accused's account, the accused continued to write checks against that account and issue them to others. Between September 24 and October 26, 2001, the accused issued approximately 14 checks totaling $2,191.70. Although those expenditures were roughly equivalent to the deposits that the accused had made, the deposits themselves were not sufficient to raise the accused's account balance to zero. The foregoing illustrates that the accused must have known that her bank would not cover all those checks.

The accused asserts in her defense that, to violate ORS 165.065, a person must intend to commit a theft. We disagree with that reading of the statute. The accused may be

correct that the legislature intended, in part, to address theft by means of writing bad checks. However, the statute on its face demonstrates that the legislature intended to prevent anyone from knowingly issuing checks that their financial institution would not cover. Here, the accused wrote checks between September 24, and October 26, 2001, and, during that period, she was aware that her bank would not cover those checks. Therefore, the accused violated ORS 165.065 when she wrote checks for the payment of money to others during that time period.

Having concluded that the Bar has established by clear and convincing evidence that the accused committed a criminal act for the purposes of DR 1-102(A)(2), we now must determine whether that criminal act is one that reflects adversely on the accused's honesty, trustworthiness, or fitness to practice law.

This is not a case in which the accused wrote one or two, or even a few, bad checks. Instead, the accused repeatedly issued to others, on several occasions, checks that her bank either dishonored outright or paid but, due to a negative account balance, charged the accused an NSF fee. As a result of that conduct, the accused incurred NSF fees more than 200 times. In addition, she engaged in that conduct over a lengthy period of time. The accused's conduct suggests a disrespect for the law and for the duties of the legal professional. With respect to the checks that she wrote to Gallops Saddlery and Case & Dusterhoff, the accused repeatedly misrepresented when she finally could provide full payment. Further, when the accused issued checks between September 24 and October 26, 2001, she implicitly represented to each payee that the payee promptly would receive a cash payment from the accused's bank account upon presentation of the check to the bank. However, as discussed, she knew that her account had a negative balance and that her bank would not honor those checks. The accused's conduct in the instances involving Gallops Saddlery and Case & Dusterhoff reflected adversely on both her honesty and her trustworthiness.

We conclude that the Bar has established, by clear and convincing evidence, that the accused committed a criminal act that reflected adversely on her honesty and her trustworthiness and, therefore, that she violated DR 1-102(A)(2).

## B. *DR 1-102(A)(3)*

■■　　DR 1-102(A)(3) provides, in part, that "[i]t is professional misconduct for a lawyer to * * * [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]" As to the prohibition against misrepresentations, this court recently explained:

> "To establish that the accused made a misrepresentation, the Bar must prove by clear and convincing evidence that the misrepresentation was 'knowing, false, and material in the sense that the misrepresentatio[n] would or could significantly influence the hearer's decision-making process.' *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001). A lawyer makes a misrepresentation 'either when the lawyer makes an affirmative false statement or when the lawyer remains silent despite having a duty to speak.' *In re Lawrence*, 337 Or 450, 464, 98 P3d 366 (2004)."

*In re Phillips*, 338 Or 125, 135, 107 P3d 615 (2005).

■　　The trial panel concluded that the accused made misrepresentations and was dishonest, in violation of DR 1-102(A)(3), when she failed to honor her obligations to Gallops Saddlery and Case & Dusterhoff in a timely manner, and when she repeatedly issued to others, including to Case & Dusterhoff, checks that she knew were not negotiable. The Bar argues that the trial panel was correct and that the same conduct that resulted in the accused violating DR 1-102(A)(2) necessarily resulted in her violating DR 1-102(A)(3). We agree.

　　The accused made the following affirmative false statements: (1) to Gallops Saddlery, that she would honor her check on September 11, 2001; (2) to Case, that her bank had not allowed her immediately to deposit Yugler's check for $122,807.05 and that her account had not been credited with that amount by September 10, 2002; (3) to Case & Dusterhoff, that her bank would honor each check that she had issued to Combs; and (4) to each person to whom she had issued a check between September 24 and October 26, 2001, that her bank would cover the check. The accused also made a false statement by nondisclosure when she failed to disclose promptly to Case & Dusterhoff her receipt of funds from Yugler when, pursuant to her fee agreement with the firm,

she had a fiduciary duty to do so. *See In re Obert*, 336 Or 640, 649, 89 P3d 1173 (2004) (citing *In re Kimmell*, 332 Or 480, 491 n 9, 31 P3d 414 (2001) (one acts in a fiduciary capacity when one handles money for the benefit of another person, "as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part")).

Each of those statements significantly influenced each hearer's decision-making process; that is, each person or business thought that the accused's checks represented prompt payment for services or goods, and that the accused's bank would cover each check. Each responded accordingly by repeatedly presenting the checks to the accused's bank for payment. In some instances, those receiving the accused's checks found themselves with no choice but to retain lawyers and file ethics complaints with the Bar. Had each person or business receiving one of the accused's checks known that her bank would not honor the check, they either would have denied their services or goods or immediately made other payment arrangements. The false statements, therefore, were material. Finally, as set out above, the relevant bank records indicate that the accused knowingly made each of those false statements. As to the accused's nondisclosure to Case & Dusterhoff, the record also demonstrates that the accused had the material facts in mind and knowingly failed to disclose them when she engaged in the nondisclosure. *See In re Kluge*, 332 Or 251, 261, 27 P3d 102 (2001) (stating the requirement for knowing nondisclosure to amount to misrepresentation under DR 1-102(A)(3)).

We conclude that the Bar has proved by clear and convincing evidence that the accused engaged in conduct involving misrepresentation and thus violated DR 1-102(A)(3).

## III. SANCTION

In determining the appropriate sanction, this court, relying on the ABA Standards, engages in a preliminary analysis in which the court weighs the duty violated, the accused's mental state, the actual or potential injury, and

any aggravating or mitigating circumstances. *See Eakin*, 334 Or at 257. The court then reviews the applicable case law. *Id.*

## A. *Preliminary Analysis*

### 1. *Duty Violated*

■  By violating DR 1-102(A)(2) and DR 1-102(A)(3), the accused violated her duty to the public to maintain her personal integrity. ABA Standard 5.1. The public must be able to trust lawyers, and it expects lawyers to observe high standards of honesty and integrity. By issuing a large number of checks that she knew that her bank would not cover, the accused demonstrated that the public could not trust her representations that, in each instance, she was providing the payee with prompt payment for services rendered. In addition, the accused's failure to disclose to Case & Dusterhoff her receipt of funds from Yugler when she had a duty to do so was deceptive and reflected a lack of integrity.

### 2. *Mental State*

"[A] lawyer's mental state when engaging in particular conduct may be intentional, knowing, or negligent." *Lawrence*, 332 Or at 510. A lawyer acts knowingly when he or she acts with "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7; *In re Dugger*, 334 Or 602, 623, 54 P3d 595 (2002). We conclude that the accused knowingly issued NSF checks to others and that she knowingly made misrepresentations to Case & Dusterhoff regarding her receipt of funds from Yugler.

### 3. *Actual or Potential Injury*

The accused caused actual injury to every person or entity who received an NSF check from her account and who then was required to expend time, effort, and, as with Gallops Saddlery, to incur bank and legal fees in their attempts to recover the amounts owed.

## B. *Aggravating and Mitigating Circumstances*

■  "[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. Here, at least four

aggravating circumstances apply. First, the accused's willingness to issue checks to others knowing that funds in her account could not cover the checks demonstrated a selfish motive. ABA Standard 9.22(b). Second, the accused repeatedly issued NSF checks to others and thus engaged in a pattern of misconduct. ABA Standard 9.22(c). Third, there are multiple offenses. ABA Standard 9.22(d). Finally, the accused has substantial experience in the practice of law. ABA Standard 9.22(i).

"[M]itigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. There are two mitigating circumstances in this case. First, the accused has no prior disciplinary record. ABA Standard 9.32(a). Second, the accused has a good reputation handling debtor-creditor issues, and witnesses testified before the trial panel as to her otherwise good character. ABA Standard 9.22(g).

C.  *Oregon Case Law*

Our preliminary analysis under the ABA Standards supports imposing a suspension for the accused's misconduct. *See* ABA Standard 5.12 (stating that suspension appropriate when lawyer knowingly engages in criminal conduct seriously adversely reflecting on lawyer's fitness to practice). We now review this court's case law.

Five of this court's prior cases guide our determination in this case. In *In re Davenport*, 334 Or 298, 49 P3d 91 (2002), the accused lawyer represented the Professional Liability Fund (PLF) and had devised a scheme that would allow the PLF to have more leverage in its dealings with plaintiffs in lawyer malpractice cases. A lawyer representing malpractice plaintiffs in a bankruptcy proceeding discovered the scheme and, during an examination, asked the accused lawyer whether he was acting on behalf of the PLF. Wishing to protect the PLF's identity, the lawyer either refused to answer or stated that he did not know the answer to most of the questions asked. Counsel for the bankruptcy trustee later filed a motion to compel the accused lawyer to answer, and, as a result, the PLF hired legal counsel to represent the lawyer. After a thorough review of the pertinent information, the

accused lawyer's counsel recommended that he change 42 of his answers. The accused lawyer complied. Malpractice counsel again questioned the accused lawyer, who again claimed a lack of knowledge in response to some of the questions asked. *Id.* at 306. This court concluded that the accused lawyer had violated, among other rules, DR 1-102(A)(2) and DR 1-102(A)(3). In reaching that conclusion, the court observed that the accused lawyer had violated, among other duties, his duty to the public to maintain his personal integrity. The court also concluded that the accused lawyer had acted intentionally and that his conduct had caused both actual and potential injury. The court imposed a two-year suspension. *Id.* at 325.

We think that the above-described conduct at issue in *Davenport* is analogous to the conduct at issue here. In both cases, the accused lawyers may have subjectively intended no harm by their conduct, but they inevitably engaged in a pattern of deceptive conduct reflecting adversely on their fitness to practice law.

In *In re Gustafson*, 333 Or 468, 41 P3d 1063 (2002), the accused lawyer was a deputy district attorney. She had been counsel in a juvenile matter, her handling of which resulted in an ethics complaint. Earlier that year, while the accused lawyer had been preparing for the juvenile's trial, she had accumulated a significant amount of documentary material relevant to the juvenile's trial. The trial court eventually dismissed the charges against the juvenile and later ordered that the juvenile's record be expunged. After the trial, the accused lawyer sought, and was granted, permission to take home some of the documentary material from the juvenile's trial so that she could prepare her response to the ethics complaint. After the court issued its expunction order, the accused lawyer failed to destroy the records that she possessed that fell within the scope of the order and even had given some of the records to her former legal counsel and to the Bar. Upon his discovery that the accused lawyer possessed that information and had distributed it, counsel for the juvenile issued to the accused lawyer a subpoena requiring her to produce all documents in her possession related to the juvenile matter. The accused lawyer produced some, but not all, of the documents and claimed that she did not know

about the expunction order. Other evidence indicated, however, that the accused lawyer had received a copy of the order. *Id.* at 477. This court concluded that, among other rules, the accused lawyer had violated DR 1-102(A)(2) and DR 1-102(A)(3). The court further concluded that the accused lawyer had violated her duty to the public to maintain personal integrity and had acted intentionally, and that her actions had caused the juvenile actual injury. The court disbarred the accused lawyer. *Id.* at 489.

As in *Gustafson*, the accused's conduct in this case exhibited a cavalier disregard for the law. The accused knew, or should have known, that it is illegal to issue to others checks that one knows his or her account cannot cover. Yet the accused continued to do so over an extended period of time, resulting in an alarmingly high number of NSF checks.

In *Lawrence*, the accused lawyer had failed to file state or federal tax returns for three consecutive years. This court concluded that the accused lawyer had violated DR 1-102(A)(2). The court further reasoned that the accused's conduct had violated his duty to the public to maintain his personal integrity, but that he had acted negligently. Although the court concluded that the accused lawyer's conduct had caused actual injury, it found the existence of several mitigating factors, including a long delay during disciplinary proceedings, during which the accused lawyer's record was unblemished. The court suspended the accused lawyer for 60 days. 332 Or at 517.

In *In re Murdock*, 328 Or 18, 968 P2d 1270 (1998), the accused lawyer was employed at a law firm where he provided indigent criminal defense to the firm's clients. For that work, the firm was compensated through an agreement with the State Court Administrator (SCA). Eventually, the firm discovered that the accused lawyer had embezzled $6,917.78 of payments received from the SCA. The Bar charged violations of DR 1-102(A)(2) and DR 1-102(A)(3), and the accused lawyer stipulated that he had violated those rules. In determining the appropriate sanction, this court concluded that the accused lawyer had violated his duty to the public to maintain personal integrity and to maintain public trust.

The court also concluded that the accused lawyer had violated duties owed to his law firm. The court explained that, "[a]lthough there is no explicit rule requiring lawyers to be candid and fair with their partners or employers, such an obligation is implicit in the prohibition of DR 1-102(A)(3)[.]" *Murdock*, 328 Or at 25. The court added that the accused's conduct was "a violation of the duty of loyalty owed by a lawyer to his or her firm based on their contractual or agency relationship." *Id.* The court concluded that the accused had acted intentionally and had caused both potential and actual injury to clients and to his law firm. The court disbarred the accused.

In this case, although the accused was not employed by Case & Dusterhoff, she received from Yugler funds that were subject to a fee sharing agreement with Case & Dusterhoff. She then promptly deposited those funds into her bank account, spent them, and failed to disclose to Case & Dusterhoff her receipt of the funds. It remains unclear whether the accused ever intended to disclose her receipt of those funds to Case & Dusterhoff. However, her failure to disclose the first few payments that she received from Yugler, and the pace at which her account balance dwindled after she deposited the check for $122,807.05, strongly suggests that, had Case not demanded payment from the accused, she likely would not have disclosed her receipt of funds to Case & Dusterhoff.

Finally, in *In re Morin*, 319 Or 547, 878 P2d 393 (1994), the accused lawyer prepared living trust packages. He and two paralegals traveled throughout Oregon and Northern California conducting seminars aimed at selling those packages. Because the accused lawyer generated a significant amount of business at those seminars, he conducted some of his business with clients by mail. More specifically, instead of having documents properly witnessed, with both the client and witnesses present, the accused lawyer began the practice of having clients sign the documents at the seminars, taking them back to his office to be witnessed by office staff, and mailing them back to the clients. After some investigation, the accused lawyer admitted to the Bar that he had engaged in that practice with over 300 clients. The Bar charged violations of, among other rules, DR 1-102(A)(2) and

DR 1-102(A)(3). *Id.* at 553-57. This court concluded that the accused had violated both rules, that he acted intentionally, and ultimately disbarred the accused lawyer. *Id.* at 566.

In *Morin*, the accused lawyer also had been charged with violations related to charging excessive fees and aiding the unlawful practice of law. Its relevance here, however, is that the misconduct at issue reflected an extended course of illegal conduct that involved material misrepresentations to a significant number of people.

The foregoing cases reveal that this court has imposed either a lengthy suspension or disbarment as the sanction for intentionally deceptive conduct that violates both DR 1-102(A)(2) and DR 1-102(A)(3). In this case, we have concluded that the accused acted knowingly. However, although the accused knowingly engaged in a pattern of misconduct and was deceptive, her conduct did not cause the sort of injury that occurred in *Gustafson*, *Murdock*, or *Morin*. The accused's conduct caused a great deal of inconvenience to many people, but it took its greatest toll on the accused herself. We conclude, therefore, that the accused should not be subject to disbarment, but that she should be subject to a lengthy suspension.

D.   *Appropriate Sanction*

Based on the foregoing review of the ABA Standards and this court's case law, we conclude that, as requested by the Bar, the accused should be suspended from the practice of law for a period of 18 months for her violations of DR 1-102(A)(2) and DR 1-102(A)(3). None of that period of suspension shall be stayed.

The accused is suspended from the practice of law for 18 months, effective 60 days from the date of the filing of this decision.