No. 15          March 28, 2013          411

IN THE SUPREME COURT OF THE
STATE OF OREGON

In re Complaint as to the Conduct of
JEFFREY F. RENSHAW,
*Accused*.
(OSB 10-08; SC S059839)

En Banc

On review of the decision of a trial panel of the Disciplinary Board.

Argued and submitted January 10, 2013.

Marc D. Blackman, Ransom Blackman LLP, Portland, argued the cause and filed the brief for the accused.

Stacy J. Hankin, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the briefs for the Oregon State Bar.

PER CURIAM

The accused is disbarred, effective 60 days from the date of this decision.

**PER CURIAM**

In this lawyer discipline proceeding, the Bar alleged that the accused violated Rule of Professional Conduct (RPC) 8.4(a)(2), which prohibits criminal conduct that reflects adversely on a lawyer's honesty and trustworthiness, and RPC 8.4(a)(3), which prohibits conduct involving dishonesty and misrepresentation that reflects adversely on a lawyer's fitness to practice law. The trial panel found that the accused had violated both rules, suspended him for one year, and imposed certain conditions on his reinstatement. On review, the Bar asks us to affirm the trial panel's findings regarding the rule violations but contends that we should disbar the accused. The accused, for his part, acknowledges that he violated RPC 8.4(a)(3), contends that he did not violate RPC 8.4(a)(2), and submits that the sanction that the trial panel imposed was appropriate. On *de novo* review, we find that the accused violated both rules and conclude that disbarment is the appropriate sanction.

We find the following facts by clear and convincing evidence. The accused was admitted to practice in Oregon in 1993. In 2003, the accused and two other lawyers formed a law firm, Johnson, Renshaw & Lechman-Su, P.C. (the firm). They organized the firm as a professional corporation under Oregon law and as an S corporation under the Internal Revenue Code. Each lawyer was an equal shareholder in the firm. After the firm was formed, each shareholder assumed different management roles. Johnson handled marketing and accounts receivables. Lechman-Su handled "big picture financial items." The accused handled day-to-day operations, including paying the firm's bills, processing funds received from clients, and addressing personnel matters.

During the relevant time period, the firm had a general checking account and a line of credit through which each shareholder was issued a firm credit card. All accounts were to be used only for business purposes. Each month, the expenses charged to each shareholder's credit card were reviewed and entered into Quickbooks, a program that the firm used to record financial transactions. The firm's part-time bookkeeper reviewed and recorded Johnson's and

Lechman-Su's credit card statements. The accused reviewed and recorded his own statements.[1]

Johnson, Lechman-Su, and the accused were compensated in two ways. Each received a regular paycheck, and, when firm revenue allowed, each also received periodic shareholder distributions. The accused was responsible for determining whether there was sufficient revenue at any given time to make a distribution. Generally, when a distribution was made, each of the three shareholders received the same amount.

In 2006, the accused made three shareholder distributions to himself without making distributions to Johnson and Lechman-Su. Those three distributions totaled $3,250. Each time that the accused made a distribution only to himself, he told Johnson and Lechman-Su that the firm lacked sufficient funds to make a shareholder distribution. When the firm's accountant was preparing the shareholders' 2006 corporate tax returns, she discovered that disparity and brought it to the accused's attention because he was the managing shareholder. The accused, however, did not bring the disparity to the attention of Johnson and Lechman-Su.

In 2007, the accused made at least four shareholder distributions only to himself. As before, each time that the accused made a distribution only to himself, he told Johnson and Lechman-Su that the firm lacked sufficient funds to make any distribution. As a result of those distributions, the accused received at least $4,000 more in distributions that year than the other two shareholders. When the firm's accountant was preparing the firm's 2007 corporate tax returns, she discovered a disparity in the amounts that the three shareholders owed the firm. According to the accountant's figures, as of December 31, 2007, the accused owed the firm $28,118.56.[2] Johnson owed $2,781.00, and Lechman-Su owed $1,752.00. Because of her concern for the

---

[1] On a few occasions, the bookkeeper offered to review and record the accused's statements, but the accused declined those offers.

[2] That amount was a combination of the accused's unauthorized shareholder distributions and a series of transactions in which the accused had used firm funds to pay personal expenses and coded them to accounts receivable.

firm's status as an S corporation, the accountant notified all three shareholders of the disparity.

The accused responded directly to the accountant, promising to repay the debt by the end of June 2008. He then sent an e-mail to Johnson and Lechman-Su, the subject line of which was "mea culpa." The e-mail stated,

"I am physically ill about this right now, so I need to cleanse my soul to you two.

"* * * * *

"[T]his is simply an accumulation of three years and my dealing with several things as a result of going through and losing the lawsuit against the title company. I am already in the midst of plans to get this cleared. It amounts to this—I owe the firm and it will be repaid.

"God I feel horrible right now. I am so sorry."

Shortly after receiving the accused's e-mail, Johnson, Lechman-Su, and the accused met to discuss the accused's actions. The accused denied experiencing personal problems and attributed the debt to the financial consequences of an unsuccessful lawsuit and also to promises that he had made to his wife to remodel their home. At the meeting, the accused did not tell Johnson or Lechman-Su that he had taken any sums other than the ones that the accountant had discovered.

The following month, while the accused was on vacation in Hawaii, Johnson and the firm's part-time bookkeeper discovered records of the accused's transactions in which he had used the firm's line of credit to pay personal expenses. For example, in February 2008, the accused had used the firm credit card to pay a personal Visa bill in the amount of $3,541.72. Also in February, the accused had made two transfers of $1,000 each from the firm's account into two nonfirm checking accounts, one of which was held by the accused's wife.

Johnson and the bookkeeper also discovered records of the accused's transactions in which he had used his firm credit card to pay personal expenses and either had failed to denote in QuickBooks that they were personal expenses or

had coded the expenses in QuickBooks as business expenses. Those transactions occurred in 2005, 2006, 2007, and early 2008. In 2005, for example, the accused had used his firm credit card to pay Companion Pet Clinic in the amount of $66.75 and Nordstrom in the amount of $965.00. In 2006, he used his firm credit card to purchase airline tickets for his family to go to Florida and also to pay various lodging expenses associated with that family vacation. The airline tickets were coded in QuickBooks as "Legal Library," and the remaining expenses were coded as "Travel," "Meals," and "Professional Development." In 2007, the accused used his firm credit card to pay a contractor to perform remodeling work on his home. He coded those expenses, which totaled $9,454.73, as "Reference Materials" and "Subcontractors."

When the accused returned from vacation, Johnson and Lechman-Su asked the accused to resign, which he did. After the accused's resignation, Johnson and the bookkeeper continued to review the accused's financial records to better understand the extent of the accused's actions. After uncovering a number of additional transactions in which the accused had used firm funds to pay personal expenses, they estimated conservatively that the accused had misappropriated at least $150,000 of the law firm's funds.[3] All of the instances in which the accused had coded a personal expense as a business expense occurred before March 2008—that is, before the meeting at which the accused had met with Johnson and Lechman-Su and sought to "cleanse [his] soul." As noted, the accused did not mention to his law partners any misappropriations at that meeting other than the ones that the accountant previously had discovered.

In March 2010, the Bar filed a formal complaint against the accused, alleging that he had violated RPC 8.4(a)(2) and RPC 8.4(a)(3).[4] As noted, in its first cause

_____

[3] The accused admitted at the trial panel hearing that he took approximately $100,000 from the firm but disputed that he took more than that. We need not decide whether the accused took $100,000, as he admitted, or $150,000, as Johnson estimated. The difference does not affect our determination regarding either the alleged rule violations or the sanction.

[4] Under RPC 8.4(a),

"It is professional misconduct for a lawyer to:

of complaint, the Bar alleged that the accused's conduct involved dishonesty and misrepresentation in violation of RPC 8.4(a)(3). In its second cause of complaint, the Bar alleged that the accused had committed a criminal act in violation of RPC 8.4(a)(2) because his conduct constituted theft by deception. *See* ORS 164.085 (defining that offense). The accused filed an answer denying the Bar's allegations.

At a hearing before the trial panel, the accused acknowledged that he took shareholder distributions in excess of those authorized by Johnson and Lechman-Su, that he used firm resources to pay personal expenses, and that he had miscoded the expenses in the firm's financial records. He acknowledged that, when he miscoded his personal expenses as business expenses, he knew that doing so would make it more difficult for his partners to discover his actions. He acknowledged that his actions "involve[ed] dishonesty [and] misrepresentation" in violation of RPC 8.4(a)(3), but he contended that his actions did not constitute criminal conduct and thus did not violate RPC 8.4(a)(2).

According to the accused, under the American Bar Association's *Standards for Imposing Lawyer Sanctions* (1991) (amended 1992) (the ABA Standards) and this court's case law, his conduct warranted a sanction no greater than "18 months, with 12 months stayed during a three * * * year term of probation on the conditions that [the accused's] practice and financial affairs be monitored by the State Lawyers Assistance Committee and that [he] actively participate in mental health counseling." The trial panel issued an opinion finding that the accused had violated both RPC 8.4(a)(2) and RPC 8.4(a)(3). After considering aggravating and mitigating factors, the panel suspended the accused for one year with certain conditions of reinstatement.[5]

---

"* * * * *

"(2) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

"(3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]"

[5] The conditions required the accused to complete a full psychological evaluation by a qualified mental health care provider and to comply with that provider's recommended treatment plan.

On review, the Bar asks this court to find, as the trial panel did, that the accused violated RPC 8.4(a)(2) and RPC 8.4(a)(3) but to disbar the accused instead of suspending him. Before considering the appropriate sanction, we first consider whether the Bar has established by clear and convincing evidence that the accused committed the alleged violations. *See In re Koch*, 345 Or 444, 447, 198 P3d 910 (2008). Because the accused does not dispute that he violated RPC 8.4(a)(3), we consider only whether he violated RPC 8.4(a)(2). That disciplinary rule provides that "[i]t is professional misconduct for a lawyer to *** commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" RPC 8.4(a)(2). As noted, the Bar alleged that the accused committed theft by deception in violation of ORS 164.085. That statute provides:

> "A person, who obtains property of another thereby, commits theft by deception when, with intent to defraud, the person *** [c]reates or confirms another's false impression of law, value, intention or other state of mind that the actor does not believe to be true[.]"

ORS 164.085(1)(a). Specifically, the Bar contends that the accused's conduct constituted theft by deception because he obtained funds that the firm, a professional corporation, owned, intentionally miscoded personal expenses as business expenses to obtain those funds, and failed to disclose his conduct to Johnson and Lechman-Su.

The accused's response is limited. As noted, the accused does not dispute that he took substantial funds from the law firm. He does not dispute that his conduct "[c]reate[d] or confirm[ed] another's false impression *** or other state of mind that the [accused] d[id] not believe to be true." And he does not dispute that he had the requisite intent to defraud. The accused argues only that his conduct did not constitute theft because he did not "obtai[n the] property of another." *See* ORS 164.085(1)(a) (stating that requirement).

In response to the Bar's argument that he took property that the firm—a professional corporation—owned, the accused argues that the firm did not observe any of the

formalities required of a corporation. It follows, he reasons, that the firm forfeited its corporate status and operated as a partnership and that he and his partners jointly owned the firm's funds. Relying on *State v. Durant*, 122 Or App 380, 857 P2d 891 (1993), the accused argues that, because he and his partners owned the firm's funds jointly and because no partner's interest in the funds was superior to another's, he could not and did not take the "property of another" within the meaning of the theft statutes.

We need not decide whether the firm lost its corporate status and should be viewed as a partnership, as the accused argues. Even if the accused were correct that the firm was operating as a partnership, the money that he took belonged to the partnership, not to the partners. *See* ORS 67.060 ("Property acquired by a partnership is property of the partnership and not of the partners individually."). The Court of Appeals decision on which the accused bases his argument preceded the enactment of ORS 67.060 and is no longer good law. When the accused took the firm's funds, he took the property of another.

The accused argues alternatively that he did not engage in theft because he "reasonably believed that [he] was entitled to the property[.]" *See* ORS 164.035 (defining that defense to theft). The accused's argument may rest on two related but separate factual premises. It may rest on the premise that some of the expenses that all the partners charged to the firm, such as lunches at which business was discussed, should be viewed as personal rather than business expenses. It also may rest on the premise that one partner on limited occasions charged personal expenses to the firm as a business expense. For example, that partner attended an American Bar Association conference in another city and charged all the cost of a rental car to the firm without distinguishing the day that he used the car for personal reasons from the days that he used it for business purposes. As we understand the accused's argument, he reasons from one or both of those factual premises that, because the other two partners used firm funds for personal expenses, he reasonably believed that he was entitled to do the same.

As the trial panel concluded, the distinction between business and personal expenses may not always have been

precise, and there may have been a few, relatively minor instances in which another partner in the firm failed to honor the distinction. However, those few instances provided no reasonable basis for the accused to believe that he was either entitled or authorized to take approximately $100,000 of the firm's funds to pay for remodeling his home, family vacations, and the like. Indeed, the fact that the accused intentionally misrepresented his reasons for charging his personal expenses to the firm is at odds with his claim that he reasonably believed that he was entitled to do so. The Bar proved by clear and convincing evidence that the accused committed "a criminal act [theft by deception] that reflects adversely on [his] honesty [and] trustworthiness[.]" *See* RPC 8.4(a)(2).[6]

Having found that the accused violated RPC 8.4(a)(2) and (3), we turn to the appropriate sanction. We first consider the duty violated, the accused's state of mind, and the actual or potential injury caused by the accused's conduct. *In re Kluge*, 332 Or 251, 259, 27 P3d 102 (2001); ABA Standard 3.0. We next decide whether any aggravating or mitigating circumstances exist. *Kluge*, 332 Or at 259. Finally, we consider the appropriate sanction in light of this court's case law. *Id.* In determining the appropriate sanction, our purpose is to protect the public and the administration of justice from lawyers who have not discharged properly their duties to clients, the public, the legal system, or the profession. *See* ABA Standard 1.1.

In violating RPC 8.4(a)(2) and RPC 8.4(a)(3), the accused breached the duty that he owed the public. *See id.* at 59 (listing a violation of RPC 8.4(a) as breaching that duty).[7] We also find that the accused acted intentionally both in taking the property and misrepresenting his bases for doing so. *See* ABA Standards at 7 (defining "intent" as "the

---

[6] Our finding that the accused violated RPC 8.4(a)(2) does not, of course, establish that the criminal act that is the predicate of that ethical violation has been proved beyond a reasonable doubt.

[7] The accused also breached the duty of loyalty that he owed the other two shareholders in the firm. *See In re Pennington*, 220 Or 343, 349, 348 P2d 774 (1960). However, that duty is not one of the duties that the ABA Standards uses to gauge the appropriate sanction. *See* ABA Standards at 5-6 (classifying sanctions based on the duties that a lawyer owes to the client, the public, the legal system, and the profession).

conscious objective or purpose to accomplish a particular result"). Finally, the accused caused actual injury to his firm and his former law partners. He intentionally took at least $100,000 from the firm, funds in which the other two shareholders had an interest.

The ABA Standards identify two situations in which disbarment is the appropriate sanction for a lawyer's breach of a duty owed to the public. Both apply here. Disbarment is appropriate when a lawyer engages in "serious criminal conduct, a necessary element of which includes *** misrepresentation *** or theft." ABA Standard 5.11(a). In this case, the accused committed acts that constitute theft by deception. Because misrepresentation and theft are necessary elements of that crime, the criminal conduct in which the accused engaged comes within the terms of ABA Standard 5.11(a). We note, however, that not every criminal act that includes those elements will warrant disbarment. The criminal conduct must be "serious." *See id.* In this case, it was. This was not an isolated instance of, for example, petty shoplifting. Rather, from 2005 to 2008, the accused repeatedly and systematically took money from his firm by misrepresenting either the firm's finances or his reasons for using the firm's money. Moreover, the accused does not dispute that he wrongfully took at least $100,000 from the firm. Both the duration of the accused's conduct and the magnitude of his theft make the accused's crime a serious one.

The ABA Standards also provide that disbarment is appropriate when a lawyer engages in "any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice." Standard 5.11(b). For the reasons discussed above, we find that the accused intentionally engaged in dishonesty and misrepresentation when he told the other two shareholders that the firm lacked sufficient funds to make shareholder distributions and when he coded personal expenses as firm expenses. Because the accused acknowledges that his conduct violated RPC 8.4(a)(3), he necessarily acknowledges that his dishonesty and misrepresentation "reflec[t] adversely on [his] fitness to practice law." *See* RPC 8.4(a)(3) (requiring

that element to establish the violation). Again, the question regarding the sanction is whether the accused's dishonesty and misrepresentation "seriously" adversely reflect on his fitness to practice law. *See* ABA Standard 5.11(b). We find that they do.

The accused owed a fiduciary duty to the other shareholders in his firm. *See In re Pennington*, 220 Or 343, 349, 348 P2d 774 (1960). He breached that duty when he repeatedly took funds that the firm owned and in which the other shareholders had an interest. This court considered a comparable issue in *Pennington* and concluded that a lawyer's practice of taking funds from his law partner over the course of several years called into serious question his trustworthiness in handling other people's money, particularly his clients' money. The court reasoned,

> "It is also urged that the accused has taken no funds of any client. He did not disclose taking his partner's funds until called to account. The long practice of taking and secreting funds not his own reflects directly on his right to be placed in a position to handle other people's property. If these were the funds of a client there would be no hesitancy in imposing the most severe sanction; particularly when we consider the intent evidenced by the long course of conduct. The same violation of the fiduciary duty to partnership funds is no less abhorrent."

*Id.* Following *Pennington*, we conclude that the duration and effect of the accused's intentional misrepresentations and dishonesty are such that they seriously adversely reflect on his fitness to practice law.

Applying the ABA Standards, we determine preliminarily that disbarment is the appropriate sanction. We now consider whether there are any mitigating factors or aggravating factors that lead to a different conclusion. We find four aggravating factors, two of which we have already considered in determining the seriousness of the accused's criminal conduct under ABA Standard 5.11(a). First, as we have already explained, the accused committed a crime. *See* ABA Standard 9.22(k). Second, the record establishes that the accused engaged in a pattern of repeated thefts from 2005 to early 2008. *See* ABA Standard 9.22(c). Third, the accused was admitted to practice in Oregon in 1993 and

has substantial experience in the practice of law. *See* ABA Standard 9.22(i). Fourth, the accused acted with a selfish motive. *See* ABA Standard 9.22(b).

We also find four mitigating factors. First, the accused has no prior disciplinary record. *See* ABA Standard 9.32(a). Second, he displayed a cooperative attitude toward the disciplinary proceedings and during the trial panel hearing. *See* ABA Standard 9.32(e). Third, the accused had a good reputation as a competent family law attorney. *See* ABA Standard 9.32(g). Fourth, the accused demonstrated remorse for his actions. *See* ABA Standard 9.32(l).

We note that the trial panel found, as a mitigating factor, that the accused acted without a "self motive." Specifically, the panel stated that the accused "offered credible evidence that he misappropriated the Firm's resources out of desperation to provide for his family, not to fund any self need or desire[.]" At oral argument, counsel for the accused stated that, while the accused acknowledged that his conduct was selfish, the fact that it was not a "self motive"—that is, that the money was not "for himself"— identifies an important distinction in "trying to gauge the moral quality of his misconduct." It is difficult to describe taking at least $100,000 of someone else's money to pay for your family's vacations, pet care, and home remodeling as either selfless or morally neutral acts. Far from being a mitigating factor, the reasons that the accused took the firm's funds constitute an aggravating factor. *See* ABA Standard 9.22(b) (providing that acting for selfish reasons is an aggravating factor).

The accused also urges us to consider, as a mitigating factor, his "personal or emotional problems." *See* ABA Standard 9.32(c). On that point, however, the accused offered no expert testimony before the trial panel to demonstrate that he suffered from any psychological or other condition that would explain his actions or mitigate his culpability. He offered no evidence that, before the hearing, he had seen a mental health professional to help him deal with any personal or emotional problems that might have caused his behavior. The only evidence of his personal or emotional problems came from the accused, who testified that he

does not handle conflict well and has a fear of failure. We do not find that the personal and emotional problems that the accused self-described are a mitigating factor. Having considered the aggravating and the mitigating factors, we are not persuaded that they warrant a sanction less than disbarment. We now turn to our precedent.

Two cases are virtually identical to this one. *See [In re Murdock](#)*, 328 Or 18, 968 P2d 1270 (1998); *Pennington*, 220 Or at 349. In each case, the lawyer took money from his firm by intentionally withholding part or all of the fees that the lawyer collected. Over eight years, Pennington "secreted" approximately $50,000. 220 Or at 345. Over two years, Murdock withheld from his firm slightly less than $10,000. 328 Or at 21.[8] In both cases, this court observed that a lawyer who "embezzles" funds from the lawyer's firm is no different from a lawyer who takes his or her client's funds and held that "disbarment generally will follow" from that conduct. *Murdock*, 328 Or at 36; *Pennington*, 220 Or at 349.

In *Murdock*, the lawyer had argued that a lesser sanction was appropriate because his actions were the result of a "long-term addiction to alcohol and illegal drugs." 328 Or at 29. The court reasoned that, even if Murdock were "affected" by a chemical dependency, that dependency did not "cause" him to take the firm's funds. *Id.* at 30. In *Pennington*, the only explanation that the lawyer offered for his conduct was that he had produced more of the firm's income than his partner, a fact that, in his view, permitted him to withhold payments that belonged to the partnership. 220 Or at 345. Pennington also offered evidence from witnesses of "high standing" that he was an able lawyer, that those witnesses had no reason to doubt his integrity, that they had no reason to believe that he had ever cheated a client, and that they believed that he "would not transgress again." *Id.* at 346.

Despite that mitigating evidence, this court ruled in both cases that the magnitude of the lawyers' ethical

---

[8] The lawyers in *Pennington* and *Murdock* withheld money that should have gone to their firms. In this case, the accused wrongfully took money that the firm already had received. Although the timing of the thefts differs, the effect is the same. In each case, the lawyer deprived his firm of funds to which the firm and the lawyer's partners were entitled.

violations warranted disbarment. *Murdock*, 328 Or at 36; *Pennington*, 220 Or at 349. That conclusion follows equally here. The accused does not suffer from the sort of addictive behavior that Murdock did and, as explained above, offered no expert evidence to establish a psychological or emotional condition that might explain his actions or mitigate his culpability. Although the accused offered character evidence on his behalf, we see no material difference between that evidence and the character evidence that Pennington offered. For more than 50 years, this court has held that the sort of conduct that the accused engaged in here warrants disbarment.[9]

The accused, however, relies on five cases that, in his view, have resulted in lesser sanctions for comparable conduct. The accused relies primarily on *In re Leisure*, 338 Or 508, 113 P3d 412 (2005). In that case, the Bar alleged that Leisure had engaged in criminal conduct in violation of *former* DR 1-102(A)(2) "by writing numerous checks that, when she wrote them, her checking account could not cover." *Id.* at 510.[10] The Bar did not allege nor did this court find that Leisure had committed the crime of theft. *See id.* at 516-19. Rather, the Bar alleged and this court found that Leisure had committed the crime of negotiating a bad check, ORS 165.065, which the court distinguished from theft. *Id.*

In setting out the facts in *Leisure*, the court described one of several matters (the Combs matter) that had resulted in Leisure's writing multiple bad checks. *See*

---

[9] We note that the effect of disbarment has not been constant. Initially, a disbarred lawyer could apply for reinstatement or admission after a period of time had passed. Bar Rule (BR) 6.1(d) changed that practice. It provided that a lawyer "disbarred as a result of a disciplinary proceeding commenced by formal complaint after December 31, 1995, shall never be eligible" to apply for admission or reinstatement. Because the Bar filed the formal complaint in *Murdock* in 1996, BR 6.1(d) applied in that case. That did not affect, however, this court's conclusion that Murdock's conduct warranted disbarment, as Pennington's conduct had earlier.

[10] The Bar also alleged and this court found that Leisure had violated *former* DR 1-102(A)(3), which prohibited conduct involving dishonesty, fraud, deceit or misrepresentation. *Leisure*, 338 Or at 510. The court based its finding on Leisure's false statements that her bank would honor certain checks, that her bank had not cleared a deposit for payment, and that she would cover certain dishonored checks. *Id.* at 520-21.

*id.* at 512-14.[11] It may be that some of the acts that Leisure took in the Combs matter would permit an inference that she intended to commit the crime of theft rather than the crime of negotiating bad checks. The Bar, however, did not allege that Leisure had committed the crime of theft, and this court did not find by clear and convincing evidence that she had intended to deprive anyone permanently of their money. In this case, by contrast, we find that the accused intended to deprive his firm and his partners permanently of a substantial sum of money and, in carrying out that intent, committed acts that constitute theft. The fact that Leisure was suspended for writing bad checks does not suggest that a lawyer who commits theft from his or her firm is not subject to disbarment.

The accused also relies on *In re Carstens*, 297 Or 155, 683 P2d 992 (1984). That case, however, provides less support for the accused than *Leisure*. In that case, Carstens and his wife jointly owned a truck, a boat, and a trailer. *Id.* at 157. After they had filed a petition for dissolution but during a period of reconciliation, Carstens signed his wife's name to certificates of title for the boat and the trailer, transferring them to his professional corporation for tax purposes. *Id.* at 158. After the reconciliation failed, Carstens sold the truck for more than it had been valued and signed his wife's name to the certificate of title for the truck. *Id.* Before doing so, however, Carstens called his lawyer in the dissolution proceeding, who advised him to go ahead with the sale. *Id.* Carstens deposited the proceeds from the sale in a separate

---

[11] The facts giving rise to the Combs matter were: A client owed Leisure and her co-counsel a substantial sum, which the client refused to pay. A third lawyer recovered a judgment from the client, which that lawyer then sought to collect. Between January and August 2002, the lawyer collected some of the judgment and disbursed approximately $9,000 to Leisure. Leisure did not disclose receipt of that money to her co-counsel. In August 2002, the lawyer collected the remainder of the judgment from the client and disbursed $122,807.05 to Leisure, who deposited the money on August 30, 2002, into her business account. Also on August 30, the lawyer who had collected the money told Leisure's co-counsel that he had recovered it. Co-counsel assumed that Leisure would send him his share of the money and went on vacation. When co-counsel returned from vacation on September 9, Leisure had not paid him his share, nor had she disclosed receipt of the money to him. He demanded his share, and Leisure wrote him a check for it. However, at that time, her business account was not sufficient to cover the check, and she ended up writing her co-counsel a series of bad checks to cover her obligation, which she ultimately paid. *Id.* at 513-14.

account and promptly advised his wife of the sale. *Id.* at 158-59.

On learning of the sale, Carstens' wife initiated criminal charges against her husband, claiming that he had forged her name on the titles for the truck, boat, and trailer and that, as a result, he had stolen her interest in them. *Id.* at 159. In the criminal proceeding, a trial court convicted Carstens of one count of forgery and one count of theft, both of which counts arose from the sale of the truck; however, the court dismissed the counts arising from the transfer of the titles to the boat and the trailer. *Id.* at 160. The Bar then brought a disciplinary proceeding against Carstens, based on those two convictions and additionally on the ground that forging his wife's name on the titles for the boat and trailer violated *former* DR 1-102(A)(3) and (4). *Id.* at 160-61.

In reviewing the Bar's charges, this court explained that it was bound by the criminal convictions and could not look behind them. *Id.* at 163. Regarding the other claims based on Carstens' forging his wife's name on the titles for the boat and trailer, the court found that no forgery had occurred. It reasoned that Carstens had "implied authority to sign his wife's name to the certificates of title to the boat trailer and the boat." *Id.* at 164-65. Regarding the sale of the truck, the court observed that Carstens should have "realized that any implied authority he previously had to sign his wife's name [to the certificate of title] must have been revoked when the reconciliation failed" and that he had "made a serious mistake in judgment by signing his wife's name to the certificate of title to the truck[,]" a mistake that the court attributed to the acrimonious relationship between Carstens and his wife. *Id.* at 166-67. However, considering that Carstens had sought advice from his lawyer before selling the truck, placed the proceeds of the sale in a separate account, promptly notified his wife of the sale, and, on learning of his wife's objections, promptly notified the purchaser that he would hold him harmless, the court concluded that only a public reprimand was warranted. *Id.*

*Carstens* provides no basis for distinguishing *Pennington* and *Murdock*, nor do the other three cases on

which the accused relies.[12] Having found no basis to depart from the ABA Standards or our case law, we conclude that, to protect the public and the administration of justice, the accused should be disbarred.

The accused is disbarred, effective 60 days from the date of this decision.

---

[12] The third case on which accused relies, *In re Goff*, 352 Or 104, 280 P3d 984 (2012), identified the rules that the attorney had violated but said nothing about the facts that gave rise to those violations. The fourth case, *In re Toth-Fejel*, 14 DB Rptr 179 (2000), involved a stipulation for discipline and has no precedential value. *See Murdock*, 328 Or at 24 n 1. In the final case on which the accused relies, *In re Fitzhenry*, 343 Or 86, 162 P3d 260 (2007), Fitzhenry and other members of the corporation for which Fitzhenry worked signed a management representation letter that misrepresented that one of several listed transactions met the criteria necessary to show the transaction as a "bill and hold" transaction on the company's books. That misrepresentation permitted the company to overstate its earnings, but Fitzhenry did not commit a theft of another's money in the way that the accused did here. The final three cases that the accused cites provide less support for his position than *Leisure* and *Carstens*.