No. 18 May 14, 2015 273

IN THE SUPREME COURT OF THE
STATE OF OREGON

In re Complaint as to the Conduct of

DAVID HERMAN,
OSB #902967,

*Accused.*

(OSB No. 12111; SC S061840)

En Banc

On review of the decision of a trial panel of the Disciplinary Board.*

Argued and submitted on September 16, 2014.

Lawrence W. Erwin, Bend, argued the cause and filed the briefs for the Accused.

Mary A. Cooper, Assistant Disciplinary Counsel, Tigard, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

The accused is disbarred, effective 60 days from the date of this decision.

_____

* Trial Panel Opinion dated November 15, 2013.

**PER CURIAM.**

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused with violating RPC 8.4(a)(3) (dishonesty and misrepresentation reflecting adversely on the accused's fitness to practice law), arising from a failed corporate venture involving the accused and two business associates. A trial panel of the Disciplinary Board determined that the Bar proved that the accused violated that rule and that he should be disbarred. The accused now seeks review of that decision, which we review *de novo.* ORS 9.536(2); BR 10.6. For the reasons that follow, we agree with the trial panel that the Bar proved by clear and convincing evidence that the accused violated RPC 8.4(a)(3) and that disbarment is the appropriate sanction.

FACTS

The accused was admitted to the Oregon State Bar in 1990 and to the Washington State Bar in 1991. In 2003, he transferred his Oregon bar membership to inactive status; four years later, the Oregon Bar placed him on non-disciplinary suspension for failure to pay his bar dues. He has, since then, remained suspended in both Oregon and Washington for continued nonpayment of dues.

In early 2008, Schutfort approached the accused about starting a business venture with him and another person, Alexander, that involved the development, manufacture, and sale of specialized testing containers designed to measure formaldehyde levels in composite wood products.[1] The three people subsequently agreed to form a business entity for that purpose, called Blue Q Labs (Blue Q), which they would co-own in equal thirds. According to testimony from the three principals at the trial panel hearing, each of them agreed to perform particular roles in Blue Q's

---

[1] According to the record, formaldehyde—a recognized carcinogen—is widely used in the production of wood binding adhesives and resins. In 2007, the California Air Resources Board (CARB) approved an airborne toxic control measure designed to reduce formaldehyde emissions from products such as hardwood plywood, particleboard, and medium density fiberboard, as well as the items made from those materials. As a result, manufacturers of such products who wanted to market them in California needed testing equipment that would help them comply with the certification program that was adopted to implement the state's new formaldehyde emission standards.

operations. Alexander—a welder and fabricator whose shop was located in Lebanon, Oregon—would fabricate the containers that physically held wood samples during testing. Schutfort would design the testing device's electronics, write its software program, and help market and install the devices, as well as train Blue Q customers in their operation. For his part, the accused agreed to manage the company's finances, participate in marketing, and perform functions ordinarily undertaken by a business's general counsel, such as drafting contracts and sales agreements. The accused had experience in conducting large, complex business transactions while in private practice and had himself incorporated between 10 and 20 businesses.

In the course of discussions, the accused suggested that, rather than form a new corporation, the principals should make use of a dormant Nevada corporation—Vintrak Information Systems (Vintrak)—that the accused already owned. According to the accused, his accountant had advised him that amending Vintrak's articles of incorporation—thereby turning that corporation into Blue Q Labs, Inc.—would allow the new business to take advantage of financial losses that had been stranded on the books of Vintrak. Schutfort and Alexander had confidence in the accused and his legal acumen, and they accepted his recommendation.[2]

In March 2008, the accused amended Vintrak's articles of incorporation by filing a certificate of amendment with the Nevada Secretary of State. As a result, the name of the corporation formally was changed to Blue Q Labs, Inc. Alexander, Schutfort, and the accused were listed in the certificate as directors, and the entity's purpose was redefined, in part, as "any lawful activity related to the construction, rental, modification, repair and sale of environmental test chambers and associated equipment and training." However, as the accused would acknowledge at the trial panel hearing, the formalities that ordinarily attend the formation and operation of a corporation—for example, the adoption

---

[2] When asked, for example, why he did not seek more information about corporate matters such as the company's bank account, Schutfort replied that he had trusted the accused because the accused "was the lawyer that took care of that type of business."

of bylaws, the issuance of stock to the three principals, the election of officers, and the conduct of meetings—were not observed.

Instead, some aspects of the old corporation remained unchanged. The accused, for example, had been Vintrak's sole corporate officer, occupying the positions of president, secretary, and treasurer. After the certificate of amendment was filed in Nevada, no new officers were elected. In addition, the accused apparently had been the sole shareholder of Vintrak. Vintrak's original articles of incorporation authorized the issuance of 1,000 shares of stock, and the Nevada certificate of amendment indicated that Vintrak stock had been issued. A corporate law expert who testified at the accused's trial panel hearing stated that, after the articles of incorporation were amended, stock ownership in Vintrak became stock ownership in Blue Q. Despite the agreement of its principals that they would own the business in equal thirds, Blue Q issued no stock after it came into existence. Instead, Blue Q's 2008 and 2009 Subchapter S corporate tax returns indicated that the accused was its sole shareholder.

After the creation of Blue Q, the accused opened a bank account for the new business at US Bank, to which the accused, Schutfort, and Alexander initially had access. Despite the fact that the accused had retained all formal positions of corporate authority after the articles of incorporation were amended, Alexander and Schutfort were listed on the account application as Blue Q's president and vice-president. The new bank account was used to pay manufacturing expenses associated with fabricating the testing containers and to receive deposits that accompanied customers' product orders.

From the start, Blue Q's business was brisk. Initial wire deposits for customer orders in July 2008 totaled more than $38,000; over the next five months, deposits totaling an additional $275,000 were made into Blue Q's account at US Bank. Demand, however, quickly outpaced the company's ability to produce a reliable product and fill orders in a timely manner. A production-related bottleneck arose in the fabrication process, for which Alexander was responsible.

As Alexander later would testify, "I told them I needed more help. I needed money. We needed more help to build." No assistance materialized, however. Instead, in the final months of 2008, the accused began subcontracting container fabrication to outside machine shops in Idaho, an arrangement that the accused did not disclose to Alexander and was intent on keeping secret from him, if possible.[3]

Shortly thereafter, the relationship among the three principals worsened. At the trial panel hearing, the principals offered divergent accounts of events that would lead to the dissolution of Blue Q. The accused testified that, in late February 2009, he, Schutfort, and Alexander met at Alexander's shop in an effort to sort out the company's fabrication problems. According to the accused, Alexander disagreed with the accused's opinion that Blue Q's success depended on a "turnaround" of Alexander's commitment to manufacturing a quality product. Instead, according to the accused, the meeting ended with Alexander quitting the corporation:

> "He finally got irritated and said, 'I'm not going to listen to this anymore. I'm done with it. I won't discuss it anymore. You bring it up again, you're not going to like my response.'
>
> "And I think—you know, at that point I said—I said words to the effect, 'Then it's over. We're done. We've got to turn it off, send people their money back, beg forgiveness or whatever.'
>
> "And he says, 'I don't care what you do. I'm not going forward with this. I'm not giving you any commitments, and I'm not going to do anything else.'"

The accused further testified that he and Schutfort then decided that, with Alexander out of the picture, they constituted a quorum of the board of directors for the purpose of conducting corporate business. Accordingly, they jointly decided to end Blue Q's operations and form another entity to continue the business of producing and marketing the

---

[3] The accused asked Schutfort in a November 2008 e-mail about a customer order, "[D]o we trust [Alexander] to send a unit from Lebanon in a timely manner, or do we do the sure thing and send one from Idaho? If we send one from Idaho then you would have to communicate to [the customer,] not to communicate [with Alexander]. That might prove tricky."

testing devices. In the accused's words, "[We] reorganized and Mr. Alexander was not involved."

Alexander gave a very different account in his testimony before the trial panel. When asked if had resigned from Blue Q or otherwise indicated that he wanted nothing more to do with the business, Alexander answered "no" to both questions. Likewise, Schutfort testified that he never voted to reorganize or dissolve Blue Q and that he had not participated in a separate meeting with the accused to consider doing so.

At about the same time as the meeting at Alexander's shop, the accused began making changes in Blue Q's operations, many without Schutfort's or Alexander's knowledge. Among other changes, the accused removed Alexander as a signatory on Blue Q's bank account.[4] The accused also began directing customers to make payments to other business entities that the accused owned or controlled. In late February 2009, the accused explained in e-mails to Blue Q's customers that the diversion of payments was necessary because Blue Q recently had been the victim of bank fraud; according to the accused, Blue Q needed to protect its funds in a new account. In his deposition in this case, however, the accused gave a different explanation. He testified that the diversion was necessary because Blue Q had experienced problems in qualifying to engage in foreign wire transfers. The accused did not produce any evidence to corroborate either of those different explanations.

By March 2009, Blue Q customers were making payments on Blue Q invoices to two entities that the accused owned or controlled, Equine Management, Inc. (EMI), and Carbcert LLC (Carbcert). In an e-mail instructing a customer to make future payments to Carbcert, the accused explained that the company simply had changed its name.

---

[4] Alexander discovered the change when he went to the bank to find out whether the account contained sufficient funds to cover a business check that he needed to write. That discovery apparently did not cause Alexander immediately to question his status in the company. As he later would testify:

"Well, we weren't quitting. We were still going to build. I mean, we were still building. Just because [the accused] took us off the account, took me off the account—I didn't know exactly why. I trusted him that there was some reason."

In reality, however, Carbcert was a new business entity created and owned by the accused.

On March 9, 2009, the accused closed Blue Q's US Bank account without notice to Alexander and Schutfort. On March 19—also without notifying Alexander and Schutfort—the accused filed a certificate of dissolution for Blue Q with the Nevada Secretary of State. In that document, the accused stated that he held all officer positions in the corporation and that he was its sole director. The certificate was accompanied by a resolution in which the accused represented that a quorum of Blue Q's directors had met and resolved to dissolve the corporation; the accused also represented that no Blue Q stock had been issued and, therefore, the accused alone was authorized under Nevada law to approve the dissolution and had done so.[5]

In winding up Blue Q's affairs, the accused made no accounting of corporate assets or liabilities to Alexander and Schutfort, and they did not receive any distribution following Blue Q's dissolution. Schutfort testified that he did not learn that Blue Q no longer existed until sometime in mid-2009. Shortly thereafter, in June 2009, Alexander formed a new company called Blue Q Labs LLC to continue manufacturing formaldehyde testing devices. That enterprise briefly included Schutfort as well.

In 2010, Alexander complained to the Bar about the accused's conduct. After an investigation, the Bar filed a formal complaint against the accused that charged him with multiple violations of RPC 8.4(a)(3).[6] In a single charge, the complaint alleged that the accused engaged in dishonest conduct by excluding Alexander and Schutfort from Blue Q's business, diverting Blue Q assets to his own

---

[5] Nevada Revised Statute (NRS) 78.580(1) provides:

"If the board of directors of any corporation organized under this chapter, after the issuance of stock or the beginning of business, decides that the corporation should be dissolved, the board may adopt a resolution to that effect. If the corporation has issued no stock, only the directors need to approve the dissolution. If the corporation has issued stock, the directors must recommend the dissolution to the stockholders. The corporation shall notify each stockholder entitled to vote on dissolution, and the stockholders entitled to vote must approve the dissolution."

[6] We set out the text of that rule below.

businesses, and filing false corporate dissolution documents with the Nevada Secretary of State. In addition, the complaint alleged that the accused contracted with other companies to perform services previously performed by Blue Q, and withheld the proceeds from these contracts from Alexander and Schutfort.

As noted, a trial panel of the Disciplinary Board found that the Bar proved that the accused violated RPC 8.4(a)(3). The trial panel found, based on the accused's demeanor at the hearing, that his testimony generally was not credible.[7] Specifically, the trial panel found that the accused intentionally had

> "filed documents that did not reflect the true state of the corporation at a time he did not have the authority to dissolve it. We have found the Accused also closed the bank account for Blue Q Labs, Inc. without authority. We have also found the Accused diverted funds that were to go to Blue Q Labs, Inc to Equine Management, a company he controlled. Finally, we have found [the accused diverted] some of this money and some assets of Blue Q Labs, Inc. to a new company called Carbcert. His actions were dishonest and deceitful; the statements in the documents were false. His actions breached the duty he owed to the directors of Blue Q Labs, Inc."

The trial panel further found:

> "Although it is unknown whether the business would have eventually turned successful, that opportunity was removed by the unilateral actions of the Accused. Whether the injury was actual or potential, injured his partners were. Each had put substantial time into the venture and it was taken away. The Accused was trusted by Mr. Alexander and Mr. Schutfort and that trust was violated."[8]

---

[7] Among other things, the trial panel noted that the accused appeared furtive on the witness stand, providing testimony that often was self-contradictory, unresponsive or evasive, and frequently so lengthy and unnecessarily detailed as to "cross[] the line from explanation to obfuscation."

[8] The trial panel made no express findings as to whether the accused contracted with outside companies for the manufacture of the testing devices and withheld proceeds from the sale of those devices from Blue Q or his associates. Nor is that allegation a primary focus of the parties' arguments on review. Accordingly, we do not consider it in our analysis.

Based on its assessment of the accused's conduct, the trial panel concluded that the appropriate sanction is disbarment:

"In this case, the dishonest conduct began when the incorporation paperwork did not issue shares to each partner. It included filing a tax return with the Accused as the only shareholder. It included filing false documents to dissolve the corporation. It also included closing down the bank account without notice to his partners and diverting funds of the business to his personal businesses."

On review, the accused argues that the complaint should be dismissed or, alternatively, that either a reprimand or a short suspension should be imposed for any violation of RPC 8.4(a)(3).

## DISCUSSION

RPC 8.4(a)(3) provides:

"(a)   It is professional misconduct for a lawyer to:

"* * * * *

"(3)   engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]"

As discussed below, the accused argues that the Bar did not prove by clear and convincing evidence that he improperly excluded Alexander and Schutfort from Blue Q's business affairs, that he diverted Blue Q's assets for his own use, or that he filed documents with the Nevada Secretary of State that contained misrepresentations. Because they are intertwined, we discuss the first two arguments jointly.

According to the accused, the only "assets" to which his associates might have been entitled were their proportionate shares of any Blue Q profits remaining after the winding up of corporate affairs. The accused asserts that the Bar failed to prove that he improperly diverted any such assets; in particular, the accused relies on the trial panel's determination that the Bar failed to prove that the accused actually owed anything to Schutfort or Alexander.[9] Instead,

---

[9] In its analysis of the appropriate sanction, the trial panel made the following observations:

the accused argues, any sums that he diverted to his own businesses constituted repayments of loans that he had advanced to or on behalf of Blue Q. Thus, the accused reasons, the Bar did not show by clear and convincing evidence that he wrongfully diverted any funds belonging to Blue Q, Schutfort, or Alexander.

We agree with the accused that the corporate bank statements, accounting ledgers, correspondence, and cancelled checks that make up large parts of the lengthy record do not provide clear and convincing evidence that he converted assets that Alexander and Schutfort necessarily were entitled to receive in the form of distributions. That said, a number of entries in Blue Q's corporate ledgers bear on our analysis of the charges against the accused. According to Blue Q's 2008 general ledger, for example, the company was owed substantial sums by business entities owned or controlled by the accused: from EMI, approximately $411,000, plus a promissory note from EMI for an additional $63,900; from an entity known as the Lazy J, $13,000; from Idaho Transportation Equipment, approximately $58,000; and from the Whitehorse Ranch, $85,000. In winding up Blue Q's financial affairs, the accused did not account for those booked assets; instead, he removed them from Blue Q's asset ledger and "reclassified" them on the Blue Q balance sheet as a loan from the accused to Blue Q.[10]

On the other side of the ledger, Blue Q's 2008 financial records showed that the accused had loaned significant sums to Blue Q to pay its operating expenses.[11] Specifically, in 2008, the ledger showed that the accused paid more than

---

"We do not find the Bar has proven indifference to making restitution. ABA Standard 9.22(j). The Bar has not proven money was owed to either Mr. Alexander or Mr. Schutfort. The Bar's own expert did not identify an amount of money that should have been paid to either person. While the Bar makes that argument, we do not find the testimony of their expert supports the argument. Mr. Schutfort has made no claim against the Accused for money."

Those observations were not made in connection with the trial panel's analysis of whether the accused violated RPC 8.4(a)(3).

[10] For a further explanation, see 357 Or at 284 n 12, below.

[11] In contrast, it appears to be undisputed that neither Schutfort nor Alexander contributed funds to Blue Q, other than smaller amounts for which they were subsequently reimbursed.

$103,000 of Blue Q's operating costs and then used EMI to cover more than $52,000 in additional business expenses, for an approximate total of $155,000. During the same period, the ledger indicated that the accused withdrew approximately $56,000 from the Blue Q account and transferred an additional $175,000 from that account to EMI. The resulting total—approximately $231,000—was approximately $76,000 greater than the total advances that the accused and his own businesses purportedly made to or on behalf of Blue Q during the same period.

To further complicate matters, Blue Q's financial accounting records show that the corporation owed a debt of more than $200,000 to the accused when it began operations. The record includes no explanation for that debt. However, the corporate ledger discloses that the accused later routed more than $160,000 in proceeds from an unrelated business transaction—the sale of mill property—through Blue Q's books, categorizing that transfer as partial repayment of the $200,000 debt noted above. Thus, confusingly, the accused appears to have used his own money to partially discharge a sizeable debt that—at least according to the corporate financial records—was personally owed to him by Blue Q.

In the absence of a coherent explanation for the various transactions described above, it is practically impossible to ascertain whether they were legitimate, fictional, or some mix of truth and subterfuge. When the accused was asked about them at the trial panel hearing, his answers generally were confusing or unresponsive.[12] What is clear is

---

[12] The accused denied that he had taken any money that belonged to Alexander or Schutfort; he explained that a "running tally" in his head showed that he was "significantly behind" when comparing what he had put into Blue Q and what he was getting out of it. On review, the accused asserts that, according to Blue Q's records, Blue Q owed $509,480 to him and his related companies as of March 31, 2009. That amount is reflected in a current asset entry on a March 31, 2009, balance sheet that is described as "loans from David Herman"; it appears to be an updated consolidated total of the balances of the various debts shown as *owed to* Blue Q by the accused's companies on Blue Q's December 31, 2008, balance sheet. As of December 31, 2008, that total was $566,897, according to the current asset column of Blue Q's balance sheet.

With the possible exception of the transfers of funds between Blue Q and EMI described above, there is no indication in Blue Q's general ledger or any of its other financial records for 2008 or 2009 that transactions with the accused's other companies that were reflected in Blue Q's current assets as of December 31,

that, without consulting his business associates, the accused intermingled his personal and related-business financial affairs with the corporate affairs of Blue Q to the point that an accurate accounting of who owed what to whom would be very difficult to reconstruct. That inadequately explained practice provides context to the trial panel's determination that the accused improperly diverted corporate assets.

As discussed, the record shows that, shortly after the February 2009 meeting at Alexander's shop, the accused began instructing Blue Q clients to withhold payments owed to Blue Q and, ultimately, to redirect those payments to accounts owned by EMI or Carbcert.[13] The accused challenges the significance of those facts. Although he admits that some Blue Q funds were paid to EMI, he asserts that that was done "to facilitate winding up of the corporate affairs of Blue Q Labs, Inc." The difficulty with that assertion is that what the accused describes as "winding up" was not undertaken pursuant to an authorized dissolution of the corporation. Instead, at best, it can be characterized as unauthorized self-help.

Although the accused testified that he wound up Blue Q's affairs based on Alexander's voluntary departure and Schutfort's consent, the trial panel disbelieved that testimony. Instead, the trial panel credited both Alexander's testimony that he did not quit Blue Q at that time and Schutfort's testimony that he and the accused did not confer as remaining corporate directors and vote to reorganize Blue Q. This court defers to such credibility findings when, as here, they are based on the trial panel's own observations

---

2008, occurred after Blue Q began operating that year. Thus, to the extent that the $509,540 entry in the March 31, 2009, balance sheet is relevant to any issue before us, it appears to reflect a bookkeeping entry whereby the accused claimed credit for pre-Blue Q financial obligations that his related companies may have owed to Vintrak. Because the record with respect to that possibility was not developed in the trial panel proceedings, we do not consider it further. However, we reiterate that there is no indication in the record that that amount—or any amount remotely approximating it—was advanced to Blue Q by the accused or any of his related entities *after* Blue Q began its operations in 2008.

[13] Although the precise amount of Blue Q receivables that the accused diverted is not clear, the record includes correspondence from the accused to a Blue Q customer directing payment of a Blue Q invoice to Carbcert, as well as a remittance from a Blue Q customer to EMI.

of the accused's demeanor and the manner in which he testified. *In re Phinney*, 354 Or 329, 333, 311 P3d 517 (2013). Moreover, we note the discrepancy between the accused's account of an agreement to reorganize the corporation and the absence of any corporate records documenting either that purported decision or an accounting of the winding up of Blue Q's affairs. In short, we agree with the trial panel that the accused's testimony that he diverted Blue Q assets to his own businesses as part of an authorized winding up of corporate affairs is not credible. Instead, clear and convincing evidence supports the trial panel's determination that the accused engaged in dishonest conduct when he diverted customer payments from Blue Q to EMI and Carbcert.

The accused remonstrates that, because Schutfort received courtesy copies of e-mails instructing Blue Q customers to send payments to EMI and Carbcert, there is no evidence that he acted with fraudulent intent.[14] Those arguments miss the mark. When Schutfort received copies of e-mails revealing that customers were paying EMI rather than Blue Q, the accused assured Schutfort that "[the Accused] was the lawyer and there was some advantage to doing that." Schutfort believed him. Moreover, Alexander was not aware of the accused's actions. Nor were Schutfort and Alexander aware of the larger context in which those actions were taking place. For example, the two were unaware that they were not shareholders in Blue Q; each believed that he owned a one-third interest in the corporation. Nor were they aware that the accused was in the process of dissolving Blue Q or that they would not receive an accounting of the assets being diverted to EMI and Carbcert.

The Bar's complaint alleged that the accused's conduct involved dishonesty and misrepresentation that reflected adversely on his ability to practice law. Under this court's prior decisions, dishonesty includes a disposition to lie, cheat, or defraud; and a lack of trustworthiness or integrity. *In re Kluge*, 335 Or 326, 340, 66 P3d 492 (2003);

---

[14] As already noted, the accused also argues that a concern about wire fraud prompted the diversion of Blue Q funds to Carbcert. However, the record shows that the accused originally had explained the diversion by telling customers that Blue Q had changed its name to Carbcert. In fact, it had not. Simply put, the accused's explanations for those actions are not credible.

*In re Claussen*, 331 Or 252, 260, 14 P3d 586 (2000). Although no rule explicitly requires lawyers to be candid and fair with their business associates or employers, such an obligation is implicit in the prohibitions set out in RPC 8.4(a)(3). *See In re Murdock*, 328 Or 18, 25, 968 P2d 1270 (1998) (so stating with regard to former version of rule); *In re Smith*, 315 Or 260, 266, 843 P2d 449 (1992) (same). On *de novo* review, we find by clear and convincing evidence that the accused's diversion of Blue Q assets to EMI and Carbcert, and his exclusion of his associates from Blue Q's business affairs, demonstrated dishonesty and a lack of trustworthiness that seriously reflects adversely on his fitness to practice law and violate RPC 8.4(a)(3).

We turn to the trial panel's determination that the accused violated RPC 8.4(a)(3) by filing with the Nevada Secretary of State "documents that did not reflect the true state of the corporation at a time he did not have the authority to dissolve it." An affirmative representation amounts to a misrepresentation under RPC 8.4(a)(3) if it is false, material, and knowingly made. *In re Summer*, 338 Or 29, 38, 105 P3d 848 (2005). A misrepresentation is material if it would or could significantly influence the recipient's decision-making process. *Id*.

Again, the accused asserts that the Bar failed to prove by clear and convincing evidence that his actions in that regard were animated by "fraudulent intent." Specifically, the accused contends that he was, in fact, the corporation's only director when he filed the certificate to dissolve Blue Q, because Schutfort and Alexander had left the company. The accused asserts that, as Blue Q's sole director, he was authorized under Nevada law to dissolve the corporation because no stock had been issued. The accused also asserts that, by the end of the February 2009 meeting at Alexander's shop, he believed that Alexander had quit Blue Q, that the accused and Schutfort constituted a quorum of directors, and that they had agreed to "reorganize."

Much of the accused's argument about the Nevada dissolution documents is foreclosed by our earlier finding that Blue Q was not dissolved in the manner in which the accused testified. Instead, the evidence underscores the

accused's misrepresentations. The accused was both an experienced business person and attorney who had formed and managed a number of corporations. The certificate of amendment by which the accused created Blue Q expressly named all three principals as directors; yet, less than a year later, the documents that the accused filed to dissolve the corporation represented to the Nevada Secretary of State that the accused was the sole director and that Blue Q's board of directors had adopted a resolution authorizing him, as president, to dissolve the corporation. The certificate also represented that no Blue Q stock had been issued. However, those representations were false. The accused was not the sole director of Blue Q, and there had been no meeting at which the board of directors had voted either to reorganize or dissolve Blue Q. Furthermore, contrary to his representation to the Secretary of State, the accused was a shareholder—indeed, the sole shareholder—of Blue Q, despite the fact that he and his associates had agreed to own the corporation in equal thirds.[15] The accused knew that the described representations were false when he made them.

The accused's misrepresentations to the Nevada authorities also were material, because they were intended to communicate that the accused was authorized to dissolve Blue Q in compliance with Nevada law. Finally, those misrepresentations reflected adversely on the accused's fitness to practice law: Not only did they violate the accused's duties to his associates, they were made to a governmental agency to achieve a result that the law did not allow. *See In re Glass*, 308 Or 297, 779 P2d 612 (1989) (attorney's registration of false business name with Corporation Commission for sole purpose of defeating contractor's capacity to bring action against him constituted misrepresentation under disciplinary rules).

Thus, we find on *de novo* review that the Bar also proved by clear and convincing evidence that, in filing the dissolution documents with the Nevada Secretary of State,

---

[15] The trial panel determined that the accused apparently was the sole shareholder of Vintrak and that, because no new stock was issued after the corporation's name was changed, the accused remained the sole shareholder of Blue Q. As noted, that determination is consistent with Blue Q's 2008 and 2009 tax returns.

the accused violated RPC 8.4(a)(3) by engaging in conduct that constituted dishonesty and misrepresentation that reflects adversely on his fitness to practice law.

Finally, we consider the appropriate sanction for the accused's ethical violations. In doing that, we follow the analytical framework set out in the American Bar Association's *Standards for Imposing Lawyer Sanctions* (ABA Standards) (1991) (amended 1992). *In re Obert*, 352 Or 231, 258, 282 P3d 825 (2012). In accordance with the ABA Standards, we first consider the duty violated, the accused's mental state, and the actual or potential injury caused by the accused's conduct. *In re Kluge*, 332 Or 251, 259, 27 P3d 102 (2001); ABA Standard 3.0. We next determine the existence of any aggravating or mitigating circumstances. *Kluge*, 332 Or at 259. Finally, we consider the appropriate sanction in light of this court's case law. *Id*. Our purpose in imposing a sanction is to protect the administration of justice from lawyers who have failed to properly discharge duties owed to their clients, the public, the justice system, or the legal profession.

Here, the accused violated RPC 8.4(a)(3) and breached his public duty as a lawyer to maintain his personal integrity. ABA Standard 5.1. The record shows that the accused excluded his associates from Blue Q's business affairs, intentionally diverted Blue Q receivables to businesses that the accused alone controlled, and misrepresented his authority to dissolve Blue Q to Nevada governmental officials. *See* ABA Standards at 7 ("intent" defined as "the conscious objective or purpose to accomplish a particular result"). As a result of that conduct, the accused caused actual injury to Alexander and Schutfort by depriving them of the opportunity to participate in the windup of Blue Q's business and a proper accounting of Blue Q's financial affairs. Under ABA Standard 5.11(b), disbarment generally is appropriate when a lawyer engages in intentional conduct that involves dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness to practice law.

We next consider whether the presence of mitigating or aggravating factors affects that preliminary determination. We find several aggravating factors. First, the accused acted with a dishonest or selfish motive. ABA Standard

9.22(b). Second, he has refused to acknowledge the wrongful nature of his conduct, ABA Standard 9.22(g), arguing in effect that he did not have to follow the law but could, instead, engage in "self-help" for ends that he believed were justified. Finally, the accused has substantial experience in the practice of law, having been admitted to the Oregon Bar in 1990.

In mitigation, the accused argues that his only misstep was in placing too much trust in his partners. The accused asserts that, after the dissolution of Blue Q, Alexander and Schutfort surreptitiously formed Blue Q Labs LLC, stole away Blue Q customers, converted devices manufactured by Blue Q, used them to fulfill customer orders as Blue Q Labs LLC, and pocketed the receipts. The accused contends that either a public reprimand or a 30-day suspension is appropriate.

The trial panel found, however, that the existence of Blue Q Labs LLC, had no relevance to its evaluation of the accused's misconduct at issue, and we agree. Blue Q Labs LLC was not formed until June 2009, several months after the accused diverted Blue Q receivables to EMI and Carbcert, and after he filed the Nevada dissolution documents. The accused's acts of dishonesty and misrepresentation—which the Bar proved by clear and convincing evidence—were complete with the dissolution of Blue Q. Consequently, in this disciplinary context, the subsequent formation of Blue Q Labs LLC does not mitigate the accused's conduct.

As a mitigating factor, we acknowledge that the accused does not have a prior disciplinary record. Taken together, however, the aggravating factors outweigh that factor and further support our preliminary determination that disbarment is the appropriate sanction.

We turn to the applicable case law. As we have recognized, case-matching in the context of disciplinary proceedings "is an inexact science." *In re Stauffer*, 327 Or 44, 70, 956 P2d 967 (1998). Still, our prior decisions provide some guidance. Those decisions show that where, as here, a lawyer has engaged in dishonesty, fraud, deceit, or misrepresentation in a business relationship involving an associate

or an employer, the court generally has concluded that disbarment was the appropriate sanction.

In *In re Pennington*, 220 Or 343, 348 P2d 774 (1960), for example, the accused lawyer secretly withheld a substantial amount of law firm income from his law partner during a seven-year period. In addition, despite an agreement to equally divide partnership income, the accused filed false partnership tax returns to conceal that conduct. When confronted, the lawyer, with the aid of a tax attorney and accountant, made a full accounting and restitution to his partner, paid all back taxes, and pleaded guilty to the crime of filing fraudulent partnership returns. Neither the Bar nor the lawyer's partner sought to prosecute him for embezzlement; indeed, the two partners reconciled and continued their business relationship for approximately three more years until their partnership was terminated for other reasons.

This court nevertheless ordered the accused to be disbarred. In doing so, the court emphasized the need to maintain the public's confidence in the legal profession:

> "No one who is admitted into the legal profession may be permitted to sully or destroy the right and need of the public to impose absolute confidence in the integrity of a lawyer. Literally thousands of personal and business transactions of unknowing people must be and are entrusted to the hands of some lawyer. Money, property and matters of personal confidence are daily entrusted to the integrity of the individual lawyer. In almost all such instances no bond or security, other than integrity, is required to assure the protection or performance of the trust. No member of the Bar need consider long wherein his duty lies. True, the rules of professional conduct may fill many pages; the opinions interpreting some of the rules, many volumes. But in the more basic conduct he is called upon to perform, any lawyer knows the simple rules that he must cling to: Simple straightforward honesty and absolute good faith. No less will suffice."

*Id.* at 347. If the funds at issue had been client funds, the court continued, it would not hesitate to impose disbarment as a sanction. "The same violation of the fiduciary duty to partnership funds," it concluded, "is no less abhorrent." *Id.* at 349.

In *In re Murdock*, this court applied similar reasoning to a breach of the duty of loyalty arising from an employment relationship. In that case, the accused lawyer was employed as a salaried associate at a law firm. As part of his duties, the lawyer represented indigent criminal defendants through the firm's contract with the State Court Administrator (SCA) and provided other services to the firm's clients on a flat-fee basis. Over a two-year period, however, the lawyer converted contract payments owed to the firm, as well as payments from the firm's flat-fee clientele, to his own personal use. *Murdock*, 328 Or at 23. This court concluded that that conduct violated the lawyer's implicit obligation to be candid and fair with his employers, as well as the duty of loyalty arising out of the employment relationship between the lawyer and the firm. *Id*. at 25-26. The court ultimately concluded that the lawyer must be disbarred. *Id*. at 36.

This court recently addressed a similar problem in [In re Renshaw](), 353 Or 411, 298 P3d 1216 (2013), where the accused lawyer was a partner with two other attorneys in a law firm. Among other things, the accused was responsible for processing funds received from clients, paying the firm's bills, and determining if the firm had sufficient revenue to make periodic shareholder distributions that augmented the partners' regular monthly paychecks. Beginning in 2006, however, the accused began making distributions to himself, but not to his partners; when they inquired, he told them that the firm lacked the funds to make distributions. The accused also began using the firm's credit line to cover personal expenses, later coding them in the firm's accounting records so that they appeared to be business expenses. In ordering disbarment, this court explained:

> "The accused owed a fiduciary duty to the other shareholders in his firm. *See In re Pennington*, 220 Or 343, 349, 348 P.2d 774 (1960). He breached that duty when he repeatedly took funds that the firm owned and in which the other shareholders had an interest."

*Id*. at 421.[16]

---

[16] That fiduciary duty extends beyond a lawyer's professional dealings with clients and legal colleagues. In *In re Phinney*, this court concluded that disbarment was warranted where the accused attorney violated RPC 8.4(a)(3) by

In cases involving violations of RPC 8.4(a)(3) in which this court has imposed a lesser sanction than disbarment, mitigating circumstances were present that do not exist in this case. For example, in *In re Leisure*, 338 Or 508, 113 P3d 412 (2005), the accused wrote a series of bad checks on which she eventually made good, but only after she paid NSF fees and was threatened with legal action. In suspending the accused for 18 months, the court explained:

> "The accused's conduct caused a great deal of inconvenience to many people, but it took its greatest toll on the accused herself. We conclude, therefore, that the accused should not be subject to disbarment, but that she should be subject to a lengthy suspension."

*Id.* at 527. No similar mitigating factors exist in this case.

Two aspects of the accused's conduct in this matter do not precisely match the circumstances in *Pennington*, *Murdock*, *Renshaw*, and *Phinney*. First, each of those cases involved the theft of assets; as discussed, the bar did not prove that the accused here actually stole assets in which, after a proper accounting in the winding up of corporate affairs, his associates would have been entitled to share. However, the accused's conduct, consisting of his exclusion of his associates from the affairs of Blue Q, his diversion of corporate assets to his own use, and his unauthorized dissolution of the corporation, is comparable to theft in terms of its nature and scale of selfish dishonesty.

Second, unlike the accuseds in *Pennington*, *Murdock*, and *Renshaw*, the accused's actions in relation to Schutfort, Alexander, and Blue Q did not involve a law firm or partners who were lawyers. That fact, however, represents a distinction without a difference. As this court explained in *In re Stodd*, 279 Or 565, 567-68, 568 P2d 665 (1977), we do not distinguish between a lawyer's professional and nonprofessional roles when dealing with the money or property of others:

> "Nothing less than the most scrupulous probity in dealing with the funds of others is compatible with admission to

---

committing theft by appropriation when he withdrew funds from bank accounts belonging to an alumni association for which he served as a volunteer treasurer. 354 Or at 340-41.

the practice of law. This is a standard that does not permit drawing a line between an attorney's professional and his non-professional roles."

Consistently with that case law, which confirms the preliminary sanction, we conclude that disbarment is the appropriate sanction.

The accused is disbarred, effective 60 days from the date of this decision.